**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GLAXOSMITHKLINE BIOLOGICALS SA and GLAXOSMITHKLINE LLC,<br><br>        Plaintiffs,<br><br>    v.<br><br>PFIZER INC., PHARMACIA & UPJOHN CO. LLC, BIONTECH SE, BIONTECH MANUFACTURING GMBH, and BIONTECH US INC.,<br><br>        Defendants. | C.A. No. 24-512-GBW<br><br>**JURY TRIAL DEMANDED** |

**JOINT CLAIM CONSTRUCTION BRIEF**

Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
Anthony D. Raucci (#5948)
**MORRIS, NICHOLS,
ARSHT & TUNNELL LLP**
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendants Pfizer Inc.,
Pharmacia & Upjohn Co. LLC, BioNTech
SE, BioNTech Manufacturing
GmbH, and BioNTech US Inc.*

Dated: March 12, 2026

Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
**RICHARDS, LAYTON & FINGER, P.A.**
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com

*Attorneys for Plaintiffs GlaxoSmithKline
Biologicals SA and GlaxoSmithKline LLC*

**TABLE OF CONTENTS**

**Pages**

I.   INTRODUCTIONS ...............................................................................................1

    A.   PLAINTIFF'S OPENING INTRODUCTION ........................................1

    B.   DEFENDANTS' ANSWERING INTRODUCTION.............................2

    C.   PLAINTIFF'S REPLY INTRODUCTION ...........................................2

    D.   DEFENDANTS' SUR-REPLY INTRODUCTION ...............................3

II.  AGREED-UPON CONSTRUCTIONS ................................................................4

III. DISPUTED CLAIM CONSTRUCTIONS ...........................................................6

    A.   "LIPOSOME(S)" ...................................................................................6

        1.   Plaintiffs' Opening Position.........................................................6

            a.   GSK's Proposed Construction Of "Liposome(s)" Gives The Claims Their Proper Scope In View Of the Intrinsic Record And Avoids Needless Complexity....................................................7

            b.   PBNT's Proposed Construction Of "Liposome(s)" Would Import New And Confusing Limitations Into The Claims. ............8

        2.   Defendants' Answering Position .................................................11

            a.   The Intrinsic Record Supports PBNT's Construction ..................12

            b.   Extrinsic Evidence Supports PBNT's Construction .....................15

            c.   GSK's Arguments for Omitting "Encapsulating" Are Not Convincing...................................................................................16

        3.   Plaintiff's Reply Position............................................................17

            a.   PBNT Incorrectly Characterizes GSK's Proposed Construction As Encompassing Hypothetical, Structureless Liposomes.....................................................................................17

            b.   PBNT's Construction Implicitly Imports Unrecited And Unnecessary Structural Limitations..............................................19

                i.   PBNT Attempts To Improperly Limit "Liposome(s)" To A Single Aqueous Core. ..................................................... 19

136371782.v1

**TABLE OF CONTENTS (cont'd)**

**Pages**

        ii.     PBNT Attempts To Import Still Further Unrecited And Inaccurate Structural Limitations On The Overall Configuration Of Liposomes. ........................................... 21

    4.    Defendants' Sur-Reply Position ...............................................24

        a.     "Encapsulating" Is a Required Structural Feature .........................24

        b.     GSK's Other Arguments Are Unavailing......................................25

B.    (i) "the liposomes encapsulating at least half of the mRNA molecules"; (ii) "a liposome within which at least one ribonucleic acid (RNA) that encodes an immunogen of interest is encapsulated"; (iii) "the lipid particles encapsulating at least half of the mRNA molecules"; (iv) "the lipids encapsulate at least half of the RNA molecules"; and(v) "the lipids encapsulate at least half of the first species of RNA molecules and at least half of the second species of RNA molecule" ........................................................28

    1.    Plaintiffs' Opening Position....................................................29

        a.     GSK's Proposed Construction Reflects The Plain And Ordinary Meaning Of "Encapsulate[]" As Understood By A POSA. ...................................................................................30

        b.     PBNT's Proposed Construction Of "Encapsulate[]" Adds Unwarranted And Confusing Limitations....................................31

    2.    Defendants' Answering Position ..............................................32

        a.     The Intrinsic Record Supports PBNT's Constructions.................32

        b.     Extrinsic Evidence Supports PBNT's Construction .....................34

        c.     GSK's Proposed Construction Fails to Clarify What the Claim Language Means and Improperly Broadens the Claim Scope...................................................................................34

    3.    Plaintiff's Reply Position.........................................................38

        a.     GSK's Proposed Construction Reflects The Plain And Ordinary Meaning Of "Encapsulate[]." .......................................38

        b.     PBNT's Proposed Construction Of "Encapsulate[]" Improperly Rewrites The Claims To Exclude An Embodiment....................................................................................38

    4.    Defendants' Sur-Reply Position ..............................................40

**TABLE OF CONTENTS (cont'd)**

**Pages**

C.     "BY ELICITING AN ANTIBODY RESPONSE AGAINST THE IMMUNOGEN IN VIVO" ...................................................................41

     1.    Plaintiffs' Opening Position.................................................................42

     2.    Defendants' Answering Position .........................................................43

     3.    Plaintiff's Reply Position....................................................................44

     4.    Defendants' Sur-Reply Position ..........................................................46

         a.    Ruling on Provisional Rights Is Not Premature..........................46

         b.    There Is No Actual Claim Construction Dispute..........................46

D.     "ELICITS AN ANTIBODY RESPONSE" .........................................................47

     1.    Plaintiff's Opening Position.................................................................47

     2.    Defendants' Answering Position .........................................................47

         a.    "*Any* Immunogen" ....................................................................48

         b.    "in vivo, ex vivo, or in vitro".....................................................49

     3.    Plaintiff's Reply Position....................................................................51

         a.    "*Any* immunogen".....................................................................52

         b.    "In vivo, ex vivo, or in vitro".....................................................52

     4.    Defendants' Sur-Reply Position ..........................................................54

         a.    "*Any* Immunogen" ....................................................................54

         b.    "In Vivo, Ex Vivo, or In Vitro" ..................................................55

E.     "AT LEAST TWO UNIT DOSES BEING SEQUENTIAL AND AT LEAST 1 WEEK APART" / "AT LEAST TWO UNIT DOSES BEING SEQUENTIAL AND ADMINISTERED AT LEAST 1 WEEK APART"..........56

     1.    Plaintiff's Opening Position.................................................................57

     2.    Defendants' Answering Position .........................................................58

         a.    The Court Should Adopt PBNT's Construction Based on the Intrinsic Record...............................................................58

         b.    The Court Should Reject GSK's Construction .............................59

**TABLE OF CONTENTS (cont'd)**

**Pages**

i.    GSK's Construction Would Render the Claim Term "Sequential" Superfluous ................................................. 59

ii.   GSK Improperly Assumes the Term "Sequential" Has Just One Plain and Ordinary Meaning .................................... 59

iii.  GSK Improperly Focuses on the Jury's Perspective Instead of a POSA's Perspective in View of the Intrinsic Record 60

3.    Plaintiff's Reply Position ........................................................ 62

4.    Defendants' Sur-Reply Position ............................................... 63

F.    "WHEREBY THE PKA IS DETERMINED AT STANDARD TEMPERATURE AND PRESSURE BY THE FOLLOWING . . . IS OBTAINED" ................................................................ 64

1.    Plaintiff's Opening Position ..................................................... 65

2.    Defendants' Answering Position .............................................. 65

a.    Mixed Formulation and Method pKa Claims Are Indefinite ......... 66

b.    The Prosecution History Supports PBNT's Position ..................... 67

3.    Plaintiff's Reply Position ........................................................ 68

4.    Defendants' Sur-Reply Position ............................................... 70

G.    "THE FORMULATION IS IMMUNOGENIC IN VIVO BY ELICITING AN ANTIBODY RESPONSE AGAINST THE [FIRST] IMMUNOGEN [AND THE SECOND IMMUNOGEN] IN VIVO" ............................................. 71

1.    Plaintiff's Opening Position ..................................................... 71

2.    Defendants' Answering Position .............................................. 72

a.    Mixed Formulation and Method Immunogenicity Claims Are Indefinite ............................................................. 72

b.    The Prosecution History Supports PBNT's Position ..................... 72

3.    Plaintiff's Reply Position ........................................................ 73

4.    Defendants' Sur-Reply Position ............................................... 73

IV.   CONCLUSIONS ................................................................................. 75

A.    Plaintiff's Conclusion ................................................................. 75

**TABLE OF CONTENTS (cont'd)**

**Pages**

B.      Defendants' Conclusion ........................................................................................75

# TABLE OF AUTHORITIES[1]

**Page(s)**

**Cases**

*Am. Patent Dev. Corp. v. Movielink, LLC,*
  604 F. Supp. 2d 704 (D. Del. 2009)........................................................................42

*Arendi Holding Ltd. v. Microsoft Corp.,*
  2010 WL 1050177 (D. Del. Mar. 22, 2010) ......................................................45, 46

*Array BioPharma, Inc. v. Alembic Pharms. Ltd.,*
  2024 WL 1637354 (D. Del. Apr. 16, 2024)...........................................................31

*Artemi Ltd. v. Safe-Strap Co., Inc.,*
  947 F. Supp. 2d 473 (D.N.J. 2013) ....................................................................45, 46

*Aventis Pharma S.A. v. Hospira, Inc.,*
  743 F. Supp. 2d 305 (D. Del. 2010)............................................................... *passim*

*BASF Corp. v. Johnson Matthey Inc.,*
  875 F.3d 1360 (Fed. Cir. 2017)............................................................................65

*Bicon, Inc. v. Straumann Co.,*
  441 F.3d 945 (Fed. Cir. 2006)..................................................................51, 59, 63

*Cisco Sys. v. Ramot at Tel Aviv Univ. Ltd.,*
  C.A. No. 21-1365-GBW, 2024 WL 4751590 (D. Del. Nov. 12, 2024)
  .................................................................................................66, 70, 72, 74

*Comaper Corp. v. Antec, Inc.,*
  596 F.3d 1343 (Fed. Cir. 2010)........................................................................30, 37

*Convolve, Inc. v. Compaq Comput. Corp.,*
  812 F.3d 1313 (Fed. Cir. 2016)............................................................................53

*Copy Prot. LLC v. Netflix, Inc.,*
  2015 WL 4639954 (D. Del. Aug. 5, 2015) ....................................................3, 9, 17

*CUPP Computing AS v. Trend Micro Inc.,*
  53 F.4th 1376 (Fed. Cir. 2022) ........................................................................21, 26

*Datacore Software Corp. v. Scale Computing, Inc.,*
  2023 WL 5207928 (D. Del. Aug. 14, 2023)........................................................65, 68

---

[1] All emphasis added unless otherwise noted.

**TABLE OF AUTHORITIES (cont'd)**

**Pages**

*Dayco Prods., Inc. v. Total Containment, Inc.*,
258 F.3d 1317 (Fed. Cir. 2001)...............................................................31, 32, 37, 38

*GlaxoSmithKline Biologicals SA v. Moderna, Inc.*,
C.A. No. 1:24-cv-01135, D.I. 127 (D. Del. Nov. 14, 2025) .....................................11

*HTC Corp. v. IPCom GmbH & Co., KG*,
667 F.3d 1270 (Fed. Cir. 2012)................................................................................66

*IPXL Holdings, L.L.C. v. Amazon.com, Inc.*,
430 F.3d 1377 (Fed. Cir. 2005)....................................................................... *passim*

*IPXL. MasterMine Software, Inc. v. Microsoft Corp.*,
874 F.3d 1307 (Fed. Cir. 2017)................................................................................68

*Irdeto Access, Inc. v. Echostar Satellite Corp.*,
383 F.3d 1295 (Fed. Cir. 2004)................................................................................61

*Jackson v. NuVasive, Inc.*,
2025 WL 823229 (D. Del. Mar. 14, 2025) ...............................................................69

*KOM Software Inc. v. NetApp, Inc.*,
1:18-cv-00160-WCB, D.I. 116 (D. Del. May 18, 2023) (attached as JA-007
Attach. 8)..................................................................................................................68

*KOM Software Inc. v. NetApp, Inc.*,
No. CV 18-160-WCB, D.I. 116 (D. Del. May 18, 2023) ...................................66, 67

*Laitram Corp. v. NEC Corp.*,
163 F.3d 1342 (Fed. Cir. 1998)...........................................................................43, 51

*Littlefuse, Inc. v. Mersen USA EP Corp.*,
29 F.4th 1376 (Fed. Cir. 2022) ...........................................................................52, 53

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc)...............................................................44, 70

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)............................................................................59, 60

*Par Pharm., Inc. v. Baxter Healthcare Corp.*,
2024 WL 4100255 (D. Del. Sept. 6, 2024), *adopted sub nom.*, *Endo USA, Inc.*
*v. Baxter Healthcare Corp.*, 2024 WL 4791229 (D. Del. Nov. 14, 2024) ..................42, 65, 71

*Pernix Ire. Pain Ltd. v. Actavis Labs. FL, Inc.*,
2017 WL 3314005 (D. Del. Aug. 3, 2017) ...............................................................68

136371782.v1

### TABLE OF AUTHORITIES (cont'd)

**Pages**

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc)..........................................................................*passim*

*Power-One, Inc. v. Artesyn Techs., Inc.*,
599 F.3d 1343 (Fed. Cir. 2010)........................................................................................58

*Promptu Sys. Corp. v. Comcast Corp.*,
92 F.4th 1372 (Fed. Cir. 2024) .............................................................................10, 19, 35, 40

*Resonate Inc. v. Alteon Websystems, Inc.*,
338 F.3d 1360 (Fed. Cir. 2003)........................................................................................39

*Rsch. Corp. Techs. v. Gensia Lab'ys, Inc.*,
10 F. App'x 856 (Fed. Cir. 2001) ....................................................................................57

*SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*,
242 F.3d 1337 (Fed. Cir. 2001)..........................................................................................9

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
8 F.4th 1285 (Fed. Cir. 2021) .....................................................................................15, 34

*Slimfold Mfg. Co., Inc. v. Kinkead Indus., Inc.*,
810 F.2d 1113 (Fed. Cir. 1987).....................................................................................45, 46

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
775 F.2d 1107 (Fed. Cir. 1985) (en banc)............................................................................62

*Sulzer Textil A.G. v. Picanol N.V.*,
358 F.3d 1356 (Fed. Cir. 2004)........................................................................................58

*Summit 6, LLC, v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015)........................................................................................57

*Thorner v. Sony Comput. Ent. Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)........................................................................................39

*U.S. Surgical Corp. v. Ethicon, Inc.*,
103 F.3d 1554 (Fed. Cir. 1997)......................................................................................9, 63

*Välinge Innovation AB v. Halstead New Eng. Corp.*,
2018 WL 2108199 (D. Del. May 7, 2018)........................................................................10, 12

*Wang Labs., Inc. v. Am. Online, Inc.*,
197 F.3d 1377 (Fed. Cir. 1999)........................................................................................61

**Statutes**

35 U.S.C. § 112(d) ..............................................................................................52, 53, 55

**TABLE OF AUTHORITIES (cont'd)**

**Pages**

35 U.S.C. § 154(d)(2) ...............................................................................................43

ix

## I.    INTRODUCTIONS

### A.    PLAINTIFF'S OPENING INTRODUCTION

Plaintiffs, GlaxoSmithKline Biologicals SA and GlaxoSmithKline LLC (collectively, "GSK"), propose claim constructions that are consistent with the intrinsic evidence and with how a person of ordinary skill in the art ("POSA") would have understood those terms as of the Asserted Patents' 2010 priority dates.   In contrast, Defendants, Pfizer Inc., Pharmacia & Upjohn Co. LLC, BioNTech SE, BioNTech Manufacturing GmbH, and BioNTech US Inc. (collectively, "PBNT"), improperly seek to import limitations from the specification, add new limitations untethered to the intrinsic record, and rewrite otherwise straightforward terms, making them unnecessarily confusing.  Accordingly, the Court should adopt GSK's proposed constructions.

This action concerns GSK's revolutionary technology that is the foundation for modern mRNA vaccines.  GSK described and claimed that technology in the Asserted Patents.

The Asserted Patents span three families and all claim a priority date to their respective provisional applications, each of which was filed on July 6, 2010 and/or August 31, 2010.  The "240 Family" includes the '475 Patent and '660 Patent.  Generally, the 240 Family Asserted Patents describe and claim methods of "eliciting an antibody response" by administering a composition of lipid-encapsulated mRNA molecules.  E.g., '475 Patent, Claim 1.

The "243 Family" includes the '693 Patent, '694 Patent, '6534 Patent, '401 Patent, and '467 Patent.  The 243 Family Asserted Patents are directed to formulations and methods of eliciting an immune response.  The formulation claims cover immunogenic lipid compositions, wherein the lipids encapsulate mRNA that encodes an immunogen.  E.g., '467 Patent, Claim 1.  The asserted method claims of the 243 Family are directed to eliciting an immune response—be it an antibody and cell-mediated response or just an antibody response—by administering a composition of lipid-encapsulated mRNA molecules.  E.g., '693 Patent, Claims 1, 34.

136371782.v1

There is only one Asserted Patent from the "248 Family": the '422 Patent.  Like the 240 Family Asserted Patents, the 248 Family Asserted Patent relates to administering a composition of lipid-encapsulated mRNA molecules, including claimed methods of "raising a protective immune response."  E.g., '422 Patent, Claim 1.

For ease of reference, throughout this brief, GSK cites to a representative specification from each family as appropriate.  For the 243 Family, GSK cites to the '467 Patent; for the 240 Family, GSK cites to the '475 Patent; and for the 248 Family, GSK cites to the '422 Patent.

### B.    DEFENDANTS' ANSWERING INTRODUCTION

This action concerns eight patents, spanning three patent families originally filed in 2010 by Novartis Vaccines and Diagnostics, Inc. ("Novartis") that GSK acquired in 2015.  Several years later, and *only after* the components of PBNT's Covid-19 vaccine became publicly known, GSK began to prosecute new broader claims—including the asserted claims here—that lack support in the original specifications in an attempt to ensnare different technology.

Now, 15 years after Novartis first filed the specifications of the Asserted Patents, GSK's proposed constructions continue its strategy to improperly broaden the scope of the asserted claims beyond what the inventors possessed and what the specifications disclose.  In contrast, PBNT's constructions precisely track the language that Novartis used in the original specifications (well before GSK had any involvement with these patent families) and also reflect the customary meanings of the proposed claim terms in the art.

### C.    PLAINTIFF'S REPLY INTRODUCTION

In their Answering Brief ("Ans. Br."), Pfizer and BioNTech (collectively, "PBNT") advance claim construction arguments that violate fundamental claim construction canons.  *First*, PBNT repeatedly seeks to construe terms in isolation—untethered from the surrounding claim language.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) ("[T]he claims

2

themselves provide substantial guidance as to the meaning of particular claim terms."). *Second*, PBNT seeks to import limitations from the specification to narrow otherwise straightforward claim limitations. *Id.* at 1319–20 (importing limitations from the specification is a "cardinal sin[]" of patent law). *Third*, PBNT's proposed constructions for "liposome" and "encapsulate" improperly require constructions themselves. *See Copy Prot. LLC v. Netflix, Inc.*, 2015 WL 4639954, at *4 (D. Del. Aug. 5, 2015) (rejecting proposed construction that "might itself require further construction"). Indeed, PBNT's proposal would require construction of "aqueous core," which is not recited in the claims at all. *See, e.g.*, Section III(A)(2)(a) at 12–15. *Fourth*, PBNT's proposed constructions improperly exclude embodiments. In short, the Court should set aside PBNT's arguments and adopt GSK's proposed constructions.

### D.   DEFENDANTS' SUR-REPLY INTRODUCTION

GSK's reply brief confirms that PBNT's claim constructions are correct. On term after term, GSK has either conceded PBNT's positions or been forced to change course in ways that undermine its own arguments.

First, GSK cannot refute that PBNT's construction for the "liposome" term comes directly from the specifications, which repeatedly emphasize that the aqueous core is encapsulated within a lipid bilayer. GSK now concedes that a liposome's lipid bilayer must have a structural relationship with the aqueous core, validating PBNT's construction requiring a lipid bilayer *encapsulating* the aqueous core.

Second, on the RNA encapsulation terms, GSK and Dr. Forrest now agree that the RNA must be "separated from any external medium by the lipid composition's lipid bilayer"—per PBNT's construction. Their remaining dispute—that the RNA need only be in an "aqueous compartment" rather than the "aqueous core"—contradicts both the specification and GSK's own statements to the PTO that the RNA is present in the aqueous core.

3

Third, GSK has conceded PBNT's construction of the term, "by eliciting an antibody response against the immunogen in vivo" in issued Claim 1 of the '467 Patent. That concession should end the claim construction dispute and confirm that GSK lacks provisional rights because Claim 16 of the '722 Publication is substantially broader: it requires only "an antibody response," which need not be (1) against the immunogen *encoded by the RNA* and/or (2) *in vivo*.

Fourth, GSK offers no credible meaning for the term "sequential" in the dosage claims. Its construction would render the term superfluous. PBNT's construction—requiring "a multiple unit dose schedule"—is the only interpretation that gives effect to all claim terms and tracks the specification.

Finally, GSK does not dispute that if the asserted claims contain a mix of composition and method limitations, they are indefinite. Because the pKa and immunogenicity limitations require performing active process steps, the asserted formulation claims are invalid as indefinite under *IPXL* and *Aventis*.

## II.    AGREED-UPON CONSTRUCTIONS

The parties have agreed to the following constructions:

| Claim Term | Joint Proposed Construction |
|---|---|
| "eliciting an antibody response against an immunogen"<br><br>U.S. Patent No. 11,655,475 (All asserted claims)<br><br>AND<br><br>"eliciting an antibody response against a coronavirus spike polypeptide immunogen"<br><br>U.S. Patent No. 11,851,660 (All asserted claims) | Preamble language is limiting. |
| "cationic lipid" | lipid capable of being positively charged |

| | |
|---|---|
| U.S. Patent No. 11,759,422 (Claims 3 and 12–13) | |
| "tertiary amine cationic lipid"<br><br>U.S. Patent No. 11,638,693 (Claims 14–16)<br><br>U.S. Patent No. 11,638,694 (Claims 5, 6, 14, 30)<br><br>U.S. Patent No. 11,666,534 (All asserted claims)<br><br>U.S. Patent No. 11,766,401 (All asserted claims)<br><br>U.S. Patent No. 11,786,467 (All asserted claims)<br><br>AND<br><br>"cationic lipid comprising a tertiary amine"<br><br>U.S. Patent No. 11,638,693 (All asserted claims)<br><br>U.S. Patent No. 11,638,694 (All asserted claims)<br><br>U.S. Patent No. 11,655,475 (All asserted claims)<br><br>U.S. Patent No. 11,851,660 (All asserted claims) | lipid with a tertiary amine capable of being positively charged |

For the purpose of this action only, and without conceding the merits of its position in the Joint Claim Construction Chart, PBNT does not object to the Court adopting GSK's proposed constructions for "cationic lipid" and "tertiary amine cationic lipid" in the Asserted Patents.

## III.    DISPUTED CLAIM CONSTRUCTIONS

### A.    "LIPOSOME(S)"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "liposome(s)"<br><br>U.S. Patent No. 11,655,475 (All asserted claims)<br><br>U.S. Patent No. 11,759,422 (All asserted claims) | lipid vesicle(s) having a lipid bilayer and an aqueous core | lipid particle(s) having a lipid bilayer encapsulating an aqueous core |

### 1.    Plaintiffs' Opening Position

The term "liposome(s)"—as plainly set forth in the specification—means "lipid vesicle(s) having a lipid bilayer and an aqueous core." The crux of the parties' dispute over "liposome(s)" is PBNT's attempt to wedge the word "encapsulating" into the construction. That is wrong for at least three reasons. *First*, the addition of "encapsulating" would create a new limitation—that the liposome's lipid bilayers "encapsulat[e]" the aqueous cores—that is not actually recited in the claim. *Second*, PBNT argue that the word "encapsulating" itself requires construction, causing a construction-within-a-construction that creates unnecessary complexity. *Third*, and relatedly, given that the asserted claims already recite the "liposome(s) encapsulating at least half of the mRNA molecules," PBNT's proposed inclusion of "encapsulating" in the "liposome(s)" construction would create unnecessary complexity, and as a result, inevitably confuse the jury. In contrast, GSK's proposed construction remains faithful to the intrinsic and extrinsic evidence by using straightforward language that does not introduce complexity or confusing redundancy.

6

        a.       **GSK's Proposed Construction Of "Liposome(s)" Gives The Claims Their Proper Scope In View Of the Intrinsic Record And Avoids Needless Complexity.**

The Asserted Patents claim inventions in the field of RNA vaccines. Although "RNA can be delivered as naked RNA (e.g., merely as an aqueous solution of RNA)," the specification explains that "RNA is preferably administered in combination with a delivery system" "to enhance both entry to . . . cells and also subsequent inter-cellular effects," among other advantages. '475 Patent at 3:23–28. Put simply, a "delivery system" helps to protect the RNA, including from RNases, which are naturally occurring enzymes that rapidly degrade RNA before it can be translated to elicit an immune response. *See* JA-008 Forrest Decl. ¶¶ 49, 65. In particular, the inventors found that "[l]iposomes are a preferred delivery system" for RNA encoding an immunogen (*i.e.*, mRNA), explaining:

> RNA is preferably encapsulated within the liposomes, and so the liposome forms an outer layer around an aqueous RNA-containing core. This encapsulation has been found to protect RNA from RNase digestion.

'475 Patent at 3:32–33, 4:58–60. An electron micrograph image of exemplary liposomes disclosed by the Asserted Patents is provided below, *see* '475 Patent at Fig. 2:



## FIG. 2

The specification describes a process for obtaining "[p]referred liposomes of the invention." '475 Patent at 3:56–57. Using that process, "[v]arious amphiphilic *lipids* can form *bilayers* in an aqueous environment to encapsulate a RNA-containing *aqueous core* as a liposome." '475 Patent at 3:53–55, '422 Patent at 2:8–10; *see also* JA-008 Forrest Decl. ¶¶ 33–37, 67–70. The resulting liposomes can have a variety of different structures (or "morphologies"). For example, the patents state that "[l]iposomes are usually divided into three groups: multilamellar *vesicles* (MLV); small unilamellar *vesicles* (SUV); and large unilamellar *vesicles* (LUV)." '475 Patent at 4:34–36; '422 Patent at 5:4–6. Whereas "SUVs and LUVs have a *single* bilayer encapsulating an aqueous core," MLVs "have *multiple* bilayers in each vesicle, forming *several* separate aqueous compartments." '475 Patent at 4:36–39; '422 Patent at 5:6–9; *see also* JA-008 Forrest Decl. ¶¶ 33–37, 67–70. Accordingly, GSK's proposed construction for "liposome(s)"—as plainly set forth in the specification—is "lipid vesicle(s) having a lipid bilayer and an aqueous core," where "a/an" mean one or more (*i.e.*, *one or more lipid bilayers and one or more aqueous cores*).

**b.    PBNT's Proposed Construction Of "Liposome(s)" Would Import New And Confusing Limitations Into The Claims.**

PBNT's proposed construction of "liposome(s)" suffers from at least three critical flaws based on its insertion of the word "encapsulating." *First*, PBNT's introduction of the word "encapsulating" would improperly create a new and extraneous limitation that is not recited in the claims. That new limitation would require "encapsulat[ion]" of an aqueous core. Although the specification discloses that certain liposomes "have a single bilayer encapsulating an aqueous core," '475 Patent at 4:36–39; '422 Patent at 5:6–9, the claims of the Asserted Patents do not recite "encapsulat[ion]" of an aqueous core. Accordingly, the Court should decline to import that structural feature from the specification into the claims as a new limitation. *See, e.g.*, *Phillips v.*

8

*AWH Corp.,* 415 F.3d 1303, 1320 (Fed. Cir. 2005) (en banc) ("[O]ne of the cardinal sins of patent law [is] reading a limitation from the written description into the claims." (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001))).

**Second**, the inclusion of "encapsulating" in PBNT's proposed construction would unnecessarily create a construction-within-a-construction situation because PBNT simultaneously contend that the word "encapsulating" itself requires construction.[2]  Thus, PBNT's proposed construction would improperly require construction. *Cf. Copy Prot. LLC v. Netflix, Inc.*, 2015 WL 4639954, at *4 (D. Del. Aug. 5, 2015) (rejecting proposed construction that "might itself require further construction" for the jury to ascertain whether the limitation is met). That approach is antithetical to the purpose of claim construction: to "clarify and when necessary to explain [to the jury] what the patentee covered by the claims."  *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  GSK's proposed construction avoids a construction that would require a further construction and thereby eliminates potential sources of confusion.

**Third**, and relatedly, given that the asserted claims already recite an "encapsulating" limitation, PBNT's proposed inclusion of "encapsulating" in the "liposome(s)" construction would create an unnecessarily complex and confusing requirement.  The specification makes clear that "RNA is preferably encapsulated within the liposomes, and so the liposome forms an outer layer around an aqueous RNA-containing core."  '475 Patent at 4:58–60.  That key feature of the invention is already captured in the claims.  Specifically, the asserted claims recite the limitation "liposomes encapsulating at least half of the mRNA molecules":

---

[2] In lieu of the claim's straightforward language "the liposomes **encapsulating** at least half of the mRNA molecules," PBNT propose "at least half of the mRNA molecules are present in an aqueous core separated from any external medium by the liposomes' lipid bilayer," transforming the single and simple term "encapsulating" into an extended phrase that invites confusion.  *See supra* Part II.

> "A method of eliciting an antibody response against an immunogen by an immune system in a large mammal, the method comprising administering to the large mammal at least two unit doses; each unit dose comprising a composition containing liposomes and messenger ribonucleic acid (mRNA) molecules; . . . the liposomes *encapsulating* at least half of the mRNA molecules."

*See* '475 Patent, Claim 1; '422 Patent, Claim 1 ("a liposome within which at least one ribonucleic acid (RNA) that encodes an immunogen of interest *is encapsulated*"). Substituting PBNT's proposed construction of "liposome(s)" into these limitations would create two encapsulation requirements in the very same limitation:

| Claim Language | Defendants' Proposed Construction |
|---|---|
| '475 Patent:<br><br>"the liposomes *encapsulating* at least half of the mRNA molecules" | '475 Patent:<br><br>"the [lipid particles having a lipid bilayer *encapsulating* an aqueous core] *encapsulating* at least half of the mRNA molecules" |
| '422 Patent:<br><br>"a liposome within which at least one ribonucleic acid (RNA) that encodes an immunogen of interest is *encapsulated*" | '422 Patent:<br><br>"a [lipid particle having a lipid bilayer *encapsulating* an aqueous core] within which at least one ribonucleic acid (RNA) that encodes an immunogen is *encapsulated*" |

Thus, PBNT's inclusion of "encapsulating" in the definition of "liposome(s)" is needlessly complex and likely to confuse the jury. *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ("[A] claim construction, if needed at all, should help resolve, not add to, uncertainty in the understanding the [jury] is to use in applying a claim term."); *cf. Välinge Innovation AB v. Halstead New Eng. Corp.*, 2018 WL 2108199, at *7–8 (D. Del. May 7, 2018) (rejecting construction that "does not help to clarify the meaning of the term and may confuse the jury").

In addition, PBNT's construction seeks to replace the well understood term "vesicle(s)" with "particle(s)" for no apparent reason.[3]  The patents and the references cited by the patents consistently describe "liposomes" as "vesicles," including "multilamellar vesicles" and small and large "unilamellar vesicles."  '475 Patent at 4:34–38; '422 Patent at 5:4–9.  Dr. Forrest similarly confirms that a POSA would understand that "liposome" refers to a type of lipid "vesicle."  JA-008 Forrest Decl. ¶¶ 68–69.  There is no reason to depart from this well understood language, as PBNT propose.

In short, the Court should adopt GSK's proposed construction.

### 2.    Defendants' Answering Position

The POSA would have understood that PBNT's construction is the plain and ordinary meaning of "liposome(s)" in view of the specifications of the Asserted Patents.[4]  The Asserted Patents expressly describe what was well-known in the art—that liposomes have three essential structural features: (1) a "lipid bilayer" (2) "encapsulating" (3) an "aqueous core."  PBNT's construction requires all three features, whereas GSK's construction requires only two—"lipid bilayer" and "aqueous core."  GSK's omission of the "encapsulating" feature improperly broadens the meaning of "liposome" to cover lipid compositions that are not "liposomes" and that the original specifications do not contemplate.[5]

---

[3] Notably, other GSK patents asserted against Moderna in this District recite "lipid particles"—a term Moderna incorrectly contends requires construction—and "liposomes," further demonstrating the two terms are not synonymous. *See, e.g.*, JA-005 Attach. 5 at Claims 1 and 11 (U.S. Patent No. 11,324,770 claiming compositions comprising "lipid particles" and "liposomes," respectively); *GlaxoSmithKline Biologicals SA v. Moderna, Inc.*, C.A. No. 1:24-cv-01135, D.I. 127 (D. Del. Nov. 14, 2025).

[4] PBNT's construction allows for multiple lipid bilayers encapsulating an aqueous core.

[5] Regarding the "particle(s)" versus "vesicle(s)" terminology, PBNT do not believe there is a substantive difference between those terms in the context of the Asserted Patents because the specifications use both to refer to "liposomes."  If the Court is inclined to adopt the "vesicle" terminology, PBNT do not object.

### a.    The Intrinsic Record Supports PBNT's Construction

PBNT's construction tracks the exact language Novartis (the drafter of the original specifications) used to describe the liposomes of the purported invention. The specifications expressly describe liposomes as having a lipid bilayer *encapsulating* an aqueous core:

> Thus, the invention provides a liposome having *a lipid bilayer encapsulating an aqueous core,…*

'422 Patent, Abstract;

> Various amphiphilic lipids can form *bilayers* in an aqueous environment to *encapsulate a RNA-containing aqueous core* as a liposome.

*Id.*, 2:8-10; '475 Patent, 3:53-55.

The specifications further explain that liposomes are typically divided into three groups, which were well known to have one or more lipid bilayers encapsulating an aqueous core:

> *Liposomes* are usually divided into three groups: multilamellar vesicles (MLV); small unilamellar vesicles (SUV); and large unilamellar vesicles (LUV). MLVs have *multiple bilayers in each vesicle, forming several separate aqueous compartments*. SUVs and LUVs have *a single bilayer encapsulating an aqueous core*;…. Liposomes of the invention are ideally LUVs….

*See, e.g.*, '422 Patent, 5:4-12; '475 Patent, 4:34-42. The descriptions in the specifications are consistent with the understanding in the art. As the specifications explain, "[u]nilamellar" (LUVs and SUVs) refers to liposomes having a *single* lipid bilayer that *encapsulates* the aqueous core. "[M]ultilamellar" ("MLVs") is a term that was routinely used in the art to describe liposomes having *multiple* concentric bilayers (like layers of an onion) that encapsulate the central aqueous core as well as other concentric aqueous compartments. The following images illustrate these three types of liposomes:[6]

---

[6] These depictions from the prior art are two-dimensional cross-sections for simplicity. In reality, liposomes are three-dimensional spheres.

12



JA-014 Ex. 5, P.R. Cullis et al., *Generating and loading of liposomal systems for drug-delivery applications*, 3 Advanced Drug Delivery Reviews 267, 271 (1989) (annotated – blue represents the encapsulated aqueous core; red represents the lipid bilayer (multiple bilayers for MLVs); green represents the additional aqueous compartments in MLVs); *see also* JA-014 Ex. 4, Ian MacLachlan, Antisense Drug Technology: Principles, Strategies, and Applications, Ch. 9: Liposomal Formulations For Nucleic Acid Discovery 237, 238 (Stanley Cooke ed. 2008) ("MacLachlan 2008") (showing relative sizes):



13

As these images show, SUVs and LUVs have a single spherical outer lipid bilayer encapsulating the central aqueous core.  MLVs have a first spherical outer lipid bilayer encapsulating a first aqueous compartment.  Within that outer bilayer is another spherical lipid bilayer encapsulating a second aqueous compartment, and so on, with the innermost spherical lipid bilayer encapsulating only the central aqueous core.    JA-014, Declaration of Jordan Green, Ph.D., In Support of Defendants' Claim Construction, ¶¶ 38, 60.  These three liposome types show that a common feature of liposomes is a lipid bilayer *encapsulating* an aqueous core.

In fact, the applicant confirmed this feature to the Examiner during prosecution of the '243 Family:

> As summarized in the abstract and paragraph [0009], the liposome has *a lipid bilayer <u>encapsulating</u> an aqueous core*….

JA-014 Ex. 7, U.S. Application No, 13/808,080, 12/11/2014 Supplemental Response, 6.

Moreover, the specifications confirm that it is the complete "encapsulation" of the aqueous core and its cargo by the surrounding lipid bilayer that protects the cargo from the external environment:

> RNA is preferably encapsulated within the liposomes, and so *the liposome forms an <u>outer layer around an aqueous RNA-containing core</u>*. <u>*This encapsulation*</u> has been found to <u>*protect RNA*</u> from RNase digestion.

'475 Patent, 4:58-64; '422 Patent, 1:65-2:5  (similar description).  Now, 15 years after Novartis described "encapsulation" as the important feature of the disclosed liposomes that protects the RNA cargo, GSK seeks to erase it from the meaning of liposome.[7]  GSK's departure from the specifications' clear description and the plain and ordinary meaning of "liposome(s)" should be rejected.

---

[7] GSK cites specification passages, emphasizing the words "lipid bilayers" and "aqueous cores," but conspicuously ignores the *encapsulation* language.  *Supr*a, 8.

14

The intrinsic evidence provides sufficient reason for the Court to adopt PBNT's constructions. *See Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) ("If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence.") (citation omitted).

### b.  Extrinsic Evidence Supports PBNT's Construction

The prior art also explains that the lipid bilayer(s) of liposomes encapsulates an aqueous core:

> *Liposomes* are artificial vesicles made up of one or more bilayers of amphipathic lipid *encapsulating* an equal number of *internal aqueous compartments*.

JA-014 Ex. 4, MacLachlan 2008, 237.  MacLachlan 2008 is cited on the face of the Asserted Patents.

> The word *liposome* derives from two Greek words, lipos (fat) and soma (body or structure), meaning a structure in which *a fatty envelope encapsulates internal aqueous compartment(s)*.

JA-014 Ex. 3, M.R. Mozafari, Liposomes, Methods in Molecular Biology, Ch. 2: Nanoliposomes: Preparation and Analysis, 30 (V. Weissig ed. 2010).[8]

> …*liposomes*, wherein an *aqueous volume* is *encapsulated* by an amphipathic *lipid bilayer*…

JA-014 Ex. 10, US 2004/0142025 (2004), ¶ [0039].  US 2004/0142025 is cited on the face of the Asserted Patents.

Moreover, the two dictionary definitions for "liposome" and "vesicle" that Dr. Forrest relies on, JA-008, ¶ 68, do not support adopting GSK's construction over PBNT's construction.  For example, the "liposome" definition explains that bilayers of "phospholipid *enclose* one or more aqueous compartments," which supports that there is a structural relationship between the lipid

---

[8] "[F]atty envelope" refers to the lipid bilayer.  JA-014, ¶ 29.

bilayer and the aqueous core of a liposome. That concept is more consistent with PBNT's proposed construction which also requires the lipid bilayer and aqueous core to have a structural relationship. JA-014, ¶ 75.

### c. GSK's Arguments for Omitting "Encapsulating" Are Not Convincing

GSK does not dispute that the lipid bilayer of liposomes encapsulates an aqueous core, but still proposes a construction that omits that feature, thus trying to capture hypothetical "liposomes" wherein the lipid bilayer does *not* encapsulate the aqueous core. GSK's attempt to broaden the claims is irreconcilable with the well-understood structure of a liposome and the specifications, which never contemplate any other structural relationship for the lipid bilayer and aqueous core other than encapsulation.

GSK's three peripheral arguments for omitting "encapsulating" are not persuasive. First, GSK argues that "introduction of the word 'encapsulating' would improperly create a new and extraneous limitation that is not recited in the claims." *Supra*, 9. Yet, GSK's own construction includes "lipid bilayer" and "aqueous core" which also are not "recited" in the claims. GSK provides no rationale for including them, while omitting "encapsulating." The fact is that (1) a "lipid bilayer" (2) "encapsulating" (3) an "aqueous core" are all claim elements because, as the specifications and the prior art explain, those are all structural features of liposomes.

Second, GSK argues that adopting PBNT's construction "would unnecessarily create a construction-within-a-construction" because "'encapsulating' itself requires construction." *Supra*, 9-10. This argument is incorrect. PBNT does not propose construing "encapsulating" alone, but rather a longer phrase that includes "encapsulating." *Infra*, § 3.B. GSK's cited cases are distinguishable because, the word "encapsulating" in PBNT's proposed construction of

"liposome" does not require any "further construction." *Cf. Copy Prot. LLC v. Netflix, Inc.*, No. 14–365–LPS, 2015 WL 4639954, at *4 (D. Del. Aug. 5, 2015).

Third, GSK argues that "the asserted claims already recite an 'encapsulating,' limitation," in the context of the RNA, but this misses the point. *Supra*, 9. *RNA encapsulation* is a separate limitation from the "liposome" limitation and unrelated to the fact that, definitionally, *the lipid bilayer encapsulates the aqueous core*. Thus, this separate limitation explains that the claimed liposome must always encapsulate RNA. GSK provides no explanation for why the required encapsulation of RNA warrants departing from the specifications' description and the understanding in the art that a liposome's lipid bilayer *encapsulates* the aqueous core.

### 3. Plaintiff's Reply Position

PBNT mischaracterize GSK's proposed construction, and PBNT's own proposed construction introduces multiple new limitations without support.[9]

#### a. PBNT Incorrectly Characterizes GSK's Proposed Construction As Encompassing Hypothetical, Structureless Liposomes.

PBNT object to GSK's proposed construction—"lipid vesicle(s) having [one or more] lipid bilayer[s] and [one or more] aqueous core[s]"—because, according to PBNT, GSK's construction encompasses "hypothetical 'liposomes' wherein the lipid bilayer does not encapsulate the aqueous core." Section III(A)(2)(c) at 16. Setting aside that no such liposomes exist, JA-008 Forrest Op. Decl. ¶¶34–36; JA-009 Forrest Reply Decl. ¶¶96–98, 103, 130, PBNT's criticisms improperly focus on "liposome" in isolation, ignoring critical context from the surrounding claim language. *Phillips*, 415 F.3d at 1314.

---

[9] Although PBNT proposed to construe "liposome(s)" as "lipid particle(s)," they now concede that they "do not object" to using GSK's terminology: "lipid vesicle(s)." Section III(A)(2), 11 n.2.

GSK's proposed construction does not deny any structural relationship between a liposome's lipid bilayer(s) and its aqueous core(s).[10]  *See infra* Part II.  As reflected in its construction, GSK agrees that "liposomes" are lipid vesicles comprised of "lipid bilayer[s]" and "aqueous core[s]."  A POSA would have understood that the one or more aqueous cores are separated from the external medium by the liposome's lipid bilayers.  JA-009 Forrest Reply Decl. ¶¶96–98, 103, 130, 137.  Moreover, all the asserted claims expressly recite that a "liposome" "encapsulat[es]" the mRNA.  A POSA would have understood—consistent with basic chemical principles—that a liposome's "lipid bilayer[s]" enclose the aqueous "compartment[s]" or "core[s]" where the hydrophilic (water-loving) mRNA necessarily resides.  JA-009 Forrest Reply Decl. ¶¶105–07, 137.  PBNT's attempt to cast GSK's proposed construction as encompassing "hypothetical" free-floating lipid vesicles, lipid bilayers, and aqueous cores without any structural or spatial relation is wrong and contrary to chemical principles.  JA-009 Forrest Reply Decl. ¶¶96–98; *see also id.* ¶¶99–113, 130–31.

In addition, as explained in GSK's opening brief, inserting an "encapsulation" requirement into the construction of "liposome(s)" is confusing, improper, and redundant because the claims already expressly require that "liposome(s)" "encapsulat[e]" the mRNA.  Section III(A)(1)(b) at 9–10 .  Inserting "encapsulat[ion]" into the definition of "liposome(s)" is unnecessary and would result in convoluted claim language that erroneously suggests two separate encapsulation requirements.  *Id.*  But, as noted, the mRNA necessarily resides in the aqueous cores.  JA-009 Forrest Reply Decl. ¶¶105–07, 113, 137.  The Court should not adopt such a redundant, needlessly

---

[10] GSK does disagree with the unrecited structural relationships that PBNT improperly attempts to import into the claims.  *See infra* Part I.B.

complex, and confusing construction. *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024).

> **b.    PBNT's Construction Implicitly Imports Unrecited And Unnecessary Structural Limitations.**

PBNT's proposed construction should also be rejected because it improperly imports multiple unnecessary structural requirements into the claims. First, through an improper implicit construction of the term "aqueous core," PBNT attempt to limit "liposomes" to structures that have just a *single* aqueous core. *See, e.g.*, Section III(A)(2)(a) at 12–15 (referring to "*the* aqueous core"). PBNT's construction not only improperly introduces a construction-within-a-construction, it is inconsistent with the intrinsic record and cherry-picks from the extrinsic record, both of which acknowledge liposomes may contain *multiple* aqueous cores. Moreover, PBNT's briefing and its expert's (Dr. Green) declaration make clear that PBNT seek to inject still further narrowing limitations that "liposome(s)" are (1) *spherical*, and (2) contain one or more *concentric* bilayers around (3) the single *central* aqueous core. *See, e.g.*, Section III(A)(2)(a) at 12–15; JA-014 Green Decl. ¶¶28, 31, 38. The intrinsic record plainly refutes this simplistic and cartoonish view of liposome structure.

> **i.    PBNT Attempts To Improperly Limit "Liposome(s)" To A Single Aqueous Core.**

Although its proposed construction reads "an aqueous core," PBNT actually seeks to limit liposomes to structures with a single aqueous core—"*the* aqueous core." Sections III(A)(2)(a) at 12-15; III(A)(2)(c) at 16-17; III(B)(2)(b) at 34. For example, despite acknowledging that MLVs— one of the "liposome" embodiments expressly described in the specifications—contain multiple aqueous *compartments* (without further structural specificity), PBNT and its expert advocate that a MLV necessarily has just one aqueous *core*—the innermost compartment. Section III(A)(2)(a)

19

at 12–15.  PBNT's annotations to its simplified MLV graphic illustrate PBNT's true construction of "an aqueous core":



**MLV'S**

*Id.* at 4.  PBNT describes the central blue portion as representing "***the*** encapsulated aqueous ***core***," while the concentric green annuli represent the "additional aqueous compartments in MLVs."  *Id.* ("[M]ultilamellar ('MLVs') is a term routinely used in the art to describe liposomes having multiple concentric bilayers (like layers of an onion) that encapsulate ***the central aqueous core*** as well as other aqueous compartments").  But the claim language makes no mention of "concentric" or "central" and does not limit the number or arrangement of aqueous cores within a liposome.

Nor do the specifications.  Both parties' experts agree that MLVs have multiple bilayers, each encapsulating an aqueous compartment, thereby creating multiple aqueous compartments (*i.e.*, cores) enclosed by one or more lipid bilayers.  *See* JA-014 Green Decl. ¶38; JA-009 Forrest Reply Decl. ¶¶85, 90, 113, 121.  However, as Dr. Forrest explains, and as discussed later, the "liposomes" of the specifications exhibit significant morphological heterogeneity (diversity in shape and structural organization)—PBNT (and Dr. Green) ignore these embodiments.  JA-009 Forrest Reply Decl. ¶¶85, 90, 124–29.

For example, Gruner 1987, a treatise dedicated to liposomes, states:

20

> Multilamellar vesicles (MLV) refer not so much to a given morphology as to liposomes that are not unilamellar.… [F]or multilamellar liposomes, the bilayers can compartmentalize the aqueous volume in an infinite number of ways. ***The cartoon of an MLV as an onionlike arrangement of concentric spherical bilayers probably applies to only a few MLV***.

JA-009 Attach. 6, Ex. 30 at 17. That description is fully consistent with the intrinsic record. PBNT's attempt to limit liposomes to a single aqueous core would improperly exclude such well known non-concentric multi-core MLV embodiments, including those in the specifications, as discussed below. *See CUPP Computing AS v. Trend Micro Inc.*, 53 F.4th 1376, 1381 (Fed. Cir. 2022) ("[A] claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct." (cleaned up)).

      **ii.     PBNT Attempts To Import Still Further Unrecited And Inaccurate Structural Limitations On The Overall Configuration Of Liposomes.**

PBNT improperly seeks to impose additional limitations on liposomes' shape and structure. PBNT's brief and accompanying expert declaration include images of liposomes that PBNT argues accurately represent the liposomes disclosed and claimed by the Asserted Patents. One such image is reproduced below:



*See* Section III(A)(2)(a) at 12–13. These cartoon illustrations of large and small unilamellar liposomes (LUVs and SUVs) and a multilamellar liposome (MLV) exhibit perfect spherical symmetry with, as indicated by PBNT's blue shading, a single aqueous core located at its center.

III(A)(2)(a) at 12–15.  Moreover, PBNT's chosen image of an MLV also depicts each of the multiple bilayers in a concentric configuration.  As Gruner 1987, quoted above, makes clear, these representations exclude the vast majority of possible liposome morphologies.  Indeed, Gruner 1987 makes clear that even for unilamellar liposomes, "shape [is] one of the few morphological features that can vary."  JA-009 Attach. 6, Ex. 30 at 17.

In its brief and in Dr. Green's declaration, PBNT doubles down on these characterizations. *See, e.g.*, Section III(A)(2)(a) at 12–13 ("'[M]ultilamellar' ('MLVs') is a term that was routinely used in the art to describe liposomes having multiple ***concentric*** bilayers (like layers of an onion) that encapsulate the ***central*** aqueous core as well as other ***concentric*** aqueous compartments."); *id.* at 5 ("MLVs have a first ***spherical*** outer lipid bilayer….  Within that outer bilayer is another ***spherical*** lipid bilayer … and so on, with the innermost ***spherical*** lipid bilayer encapsulating only the ***central*** aqueous core"); JA-014 Green Decl. ¶31 ("[T]he amphiphilic lipids form a ***continuous*** lipid bilayer—a ***spherical*** shell that fully surrounds the interior space…."); Green Decl. ¶38 ("MLVs have multiple ***concentric*** lipid bilayers which encapsulate a ***central*** aqueous core as well as multiple ***concentric*** aqueous compartments.").

Not only do the patents never describe—let alone claim—liposomes as "spherical" or limited to "concentric" bilayers around a single "central" aqueous core, as PBNT suggest, they unequivocally dispel any such notions.  Specifically, when describing the exemplary experiments underlying the inventors' discoveries, the patents explain that "[m]RNA was encapsulated by the method" of two references referred to herein as "Maurer" and "Jeffs."  *See, e.g.*, '475 Patent at 25:32–33; JA-009 Attach. 6, Ex. 11 (Maurer); JA-008 Attach. 1, Ex. 9 (Jeffs).  Maurer and Jeffs both include images of liposomes formed by the method described in the Asserted Patents, demonstrating a diverse array of morphologies—including MLVs exhibiting starkly ***non-***

22

*spherical* and with ***non-concentric*** arrangements of lipid bilayers and aqueous cores, including liposomes wherein the "inter-bilayer binding is discontinuous and the outer membrane exhibits bulbs," and "small dense" vesicles.  JA-009 Attach. 6, Ex. 11 at 2318–19; JA-008 Attach. 1, Ex. 9 at 368; *see also* JA-009 Forrest Reply Decl. ¶¶85, 90, 123–26.

| Maurer Figure 6A | Jeffs Figure 7 |
|---|---|
|  | |

This morphological heterogeneity was well known to POSAs at the time of invention.  This is plain from Gruner 1987, quoted above, and from Mozafari 2010, a treatise cited in the specification—and by Dr. Green—that explicitly notes:  "Liposomes are composed of one or more concentric ***or non-concentric*** lipid and/or phospholipid bilayers."  *See* JA-014 Green Decl., Ex. 3 at 30.   GSK's proposed construction is consistent with accepted use in the art and fully accommodates the intrinsic record.

To the extent PBNT's construction requires "liposomes" to (1) be spherical, (2) contain concentric and/or continuous bilayers, or (3) comprise a single, central aqueous core, it should be rejected.

**4.    Defendants' Sur-Reply Position**

**a.    "Encapsulating" Is a Required Structural Feature**

PBNT's construction comes directly from the specification, which repeatedly makes clear that "the invention provides a liposome *having a lipid bilayer encapsulating an aqueous core*." '422 Patent, Abstract; *see also id.* at 1:46-47, 1:65-2:5.  GSK's Reply Brief confirms that PBNT's construction is correct.  As PBNT explained, GSK's broader construction covers "hypothetical 'liposomes' wherein the lipid bilayer does not *encapsulate* the aqueous core." *Supra*, 16.  GSK responded that "no such liposomes exist." *Supra*, 17.  That is exactly the point.  GSK's construction is incomplete because it omits the necessary "encapsulating" feature—i.e., the structural relationship between the lipid bilayer and the aqueous core that the specifications require and was well known in the art.[11]

GSK now concedes that a structural relationship between the lipid bilayer and the core is required: "a POSA would have understood that the one or more aqueous cores are separated from the external medium by the liposome's lipid bilayers." *Supra*, 18.  The specifications call this structural separation "encapsulation," but GSK introduces a new term, arguing that "a liposome's 'lipid bilayer[s]' *enclose* the aqueous 'compartment[s]' or 'core[s]'…."[12]    *Id.*  GSK's turn of phrase should be rejected.  The specifications *never* use "enclosing" to describe the structural relationship between the lipid bilayer and the aqueous core; *only* "encapsulating" is used (70+ times). *Infra*, 35.  GSK's new "enclosing" structural feature fails to capture the "encapsulating" structural relationship that the specification repeatedly describes.  As Dr. Green explained, "enclose" is broader than "encapsulate." *Infra*, 36; JA-014, ¶95.

---

[11] *See supra*, 12-16; JA-0014, ¶¶28-29, 37-38, 63-66.
[12] To the extent GSK is attempting to equate "aqueous cores[s]" with "aqueous compartment[s]," that is incorrect—both parties' constructions recite "aqueous core." JA-015, ¶¶27-28.

GSK repeats that "encapsulating" is "confusing, improper, and redundant because the claims already expressly require that 'liposome(s)' 'encapsulat[e]' the mRNA." *Supra*, 18. As PBNT explained, it is not "confusing, improper, [or] redundant" to require (1) the liposome's lipid bilayer to encapsulate the aqueous core and (2) the liposome to encapsulate RNA in the aqueous core. *Supra*, 16-17; *see also* JA-015, Sur-Reply Declaration of Jordan Green, Ph.D. In Support of Defendants' Claim Construction, ¶24. That is exactly how the specifications repeatedly describe liposomes and RNA encapsulation: "[T]he invention provides a *liposome having a lipid bilayer encapsulating an aqueous core*, wherein: … *the aqueous core includes a RNA* which encodes an immunogen." '422 Patent, Abstract. GSK and Dr. Forrest offer no response.

### b.    GSK's Other Arguments Are Unavailing

Seeking to avoid the "encapsulating" feature of the specification, GSK focuses its reply brief on a host of new extrinsic evidence, including irrelevant expert opinion and post-priority art, to argue that liposomes can have multiple aqueous cores or that the lipid bilayer need not be continuous or, in the context of an MLV, concentric. *Supra*, 19-23; JA-009, ¶¶80-116. These arguments are unavailing.

First, GSK's argument that the liposomes of the Asserted Patents can have multiple aqueous cores is incorrect. *Supra*, 19-20. The specifications *never* describe liposomes with multiple aqueous cores—"aqueous core" *never* appears in plural form; all references are to "an aqueous *core*" or "the aqueous *core*." *Supra*, 12-14; JA-015, ¶¶26-28. GSK even explained to the PTO: "it is *evident* that 'encapsulation' requires that the RNA be present in the aqueous '*core*' of the liposome…." JA-014 Ex. 7 at 6. Again, GSK and Dr. Forrest have no response.

Dr. Green's declaration tracks the intrinsic record. As he explains, SUVs, LUVs, and MLVs were understood to have a single "aqueous core," encapsulated by a lipid bilayer. JA-014 , ¶¶37-38; JA-015, ¶¶29-31. That MLVs have additional "separate aqueous compartments" does

25

not mean there is more than one "aqueous core." JA-014, ¶38; JA-015, ¶28. The specification's use of different terminology ("compartments") to describe the additional aqueous regions of an MLV makes clear that the "separate aqueous compartments" are not all "aqueous cores," as GSK proposes.[13] *Id.* GSK and Dr. Forrest do not identify a single passage in the prior art describing liposomes having multiple aqueous cores. *Id.*, ¶29. Dr. Forrest himself only references a single "aqueous core" in the context of liposomes in a contemporaneous publication: "DNA can be encapsulated in *the* aqueous *core* within the liposome." JA-015 Ex. 17, 901. Indeed, the term "core" itself signifies a single central region. *Id.*, ¶31.

GSK's reliance on Gruner 1987 also fails. Gruner 1987 does not discuss the "aqueous core" of liposomes, let alone teach liposomes with multiple "aqueous cores." JA-015, ¶30. Additionally, the passage questioning "*the* onionlike cartoon" of MLVs showing concentric bilayers and a central aqueous core, *supra*, 20-21; JA-009, ¶121, only underscores that this "cartoon" was the typical depiction of MLV structure at the time. JA-015, ¶33. That the art continued to use the onion-like representation of MLV structure—e.g., Cullis 1989 and MacLachlan 2008—confirms that Gruner's speculative viewpoint in 1987 never became mainstream. *Id.*, ¶34. Therefore, Dr. Forrest's "opinion" that Gruner "*dispels any misunderstanding* that liposomes must be restricted to such simplistic representations," JA-009, ¶121, is a gross overstatement. *See* JA-015, ¶34.

Second, GSK's arguments regarding the lipid bilayer are also unpersuasive. *Supra*, 21-23. GSK relies primarily on Dr. Forrest's misinterpretations that Maurer 2001 and Jeffs 2005 describe

---

[13] GSK's citation to *CUPP Computing AS v. Trend Micro Inc.*, 53 F.4th 1376, 1381 (Fed. Cir. 2022), is inapposite because the specifications here do not describe MLVs as a "preferred embodiment." Rather, "[l]iposomes of the invention are *ideally* LUVs." *E.g.*, '422 Patent, 5:10-11.

discontinuous lipid bilayers and MLVs with nonconcentric lipid bilayers. *Id*. For example, Dr. Forrest opines:

> As Maurer 2001 *expressly states*, the bilayers in multilamellar liposomes *need not be concentric* or *continuous*.

RD, ¶99. But as Dr. Green explains, Maurer 2001 expressly teaches the opposite—reported MLV liposomes *do*, in fact, have "concentric" bilayers, JA-015, ¶¶40-41:

> It is shown that in the presence of ethanol small multilamellar liposomes with <u>*concentric bilayer*</u> shells are formed….

> ****

> The <u>*concentric bilayers*</u> of multilamellar liposomes can be clearly seen.

> ****

> Ethanol induces the formation of large multilamellar liposomes with <u>*concentric bilayer*</u> shells (Fig. 10 A).

JA-009 Ex. 11 at 2311; 2319 Figure 6; 2321; 2324.

Dr. Forrest also misinterprets the teaching in Maurer 2001, "in some liposomes, the interbilayer binding is discontinuous and the outer membrane exhibits bulbs," *id.*, 2318, as teaching "discontinuous" liposomal lipid bilayers. JA-009., ¶¶99, 126. As Dr. Green explains, Maurer 2001 describes the "*interbilayer* binding" as "discontinuous," not the lipid bilayers. JA-015, ¶42. Dr. Forrest cites no prior art reference actually teaching discontinuous liposomal lipid bilayers. *Id.*

GSK and Dr. Forrest also appear to misinterpret the "small dense particles" in Jeffs 2005 as liposomes having nonconcentric and discontinuous lipid bilayers, as well as multiple aqueous cores. *Supra*, 22-23; JA-009, ¶¶85, 107, 126. But Jeffs 2005 used the term "small dense particles" to distinguish them from other observed structures that had a lipid bilayer and an aqueous core

27

(e.g., lamellar vesicles).  JA-015, ¶45.  Indeed, Jeffs 2005 does not teach that "small dense particles" have lipid bilayers, an aqueous core, or aqueous compartments.  *Id.*, ¶44.

These misinterpretations of the prior art undercut Dr. Forrest's opinions and GSK's claim construction positions, as does the fact that Dr. Forrest relies on post-priority publications describing speculative structural modeling of lipid nanoparticles that the authors *never* describe as "liposomes"—i.e., Leung 2012 and Dehghani-Ghahnaviyeh 2023.  JA-009, ¶¶102-103; 108-113.

**B.    (i) "the liposomes encapsulating at least half of the mRNA molecules"; (ii) "a liposome within which at least one ribonucleic acid (RNA) that encodes an immunogen of interest is encapsulated"; (iii) "the lipid particles encapsulating at least half of the mRNA molecules"; (iv) "the lipids encapsulate at least half of the RNA molecules"; and(v)  "the lipids encapsulate at least half of the first species of RNA molecules and at least half of the second species of RNA molecule"**

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "the liposomes encapsulating at least half of the mRNA molecules"<br><br>'475 Patent all asserted claims | No construction necessary: Plain and ordinary meaning, *i.e.*:<br>"the liposomes enclosing at least half of the mRNA molecules" | "at least half of the mRNA molecules are present in an aqueous core separated from any external medium by the liposomes' lipid bilayer" |
| "a liposome within which at least one ribonucleic acid (RNA) that encodes an immunogen of interests is encapsulated"<br><br>'422 Patent all asserted claims | No construction necessary: Plain and ordinary meaning, *i.e.*:<br>"a liposome within which at least one ribonucleic acid (RNA) that encodes an immunogen of interest is enclosed" | "at least one RNA that encodes an immunogen of interest is present in an aqueous core separated from any external medium by the liposome's lipid bilayer" |
| "the lipid particles encapsulating at least half of the RNA molecules" | No construction necessary: Plain and ordinary meaning, *i.e.*: | "at least half of the mRNA molecules are present in an aqueous core separated from any external medium by the lipid particles' lipid bilayer" |

| '660 Patent all asserted claims | "the lipid particles enclosing at least half of the mRNA molecules" | |
|---|---|---|
| "the lipids encapsulate at least half of the RNA molecules"<br><br>'693 Patent all asserted claims; '694 Patent all asserted claims; '534 Patent all asserted claims; '401 Patent all asserted claims; '467 Patent all asserted claims | No construction necessary: Plain and ordinary meaning, *i.e.*:<br>"the lipids enclosing at least half of the RNA molecules" | "at least half of the RNA molecules are present in an aqueous core separated from any external medium by the lipid's lipid bilayer" |
| "the lipids encapsulate at least half of the first species of RNA molecules and at least half of the second species of RNA molecule"<br><br>'694, all asserted claims | No construction necessary: Plain and ordinary meaning, *i.e.*:<br>"the lipids enclosing at least half of the first species of RNA molecules and at least half of the second species of RNA molecule" | "at least half of the molecules of the first species of RNA and at least half of the second species of RNA are present in an aqueous core separated from any external medium by the lipids' lipid bilayer" |

### 1.    Plaintiffs' Opening Position

The claim phrases at issue here all include straightforward terms that would have been understood by a POSA as of the priority date of the Asserted Patents. Each claim phrase recites a key aspect of the claimed invention already discussed above—that a lipid structure (*e.g.*, liposome) "encapsulate[s]" RNA (*i.e.*, mRNA) molecules. Notably, the specifications of the Asserted Patents all use the term "encapsulate[]" to describe how, for example, a liposome protects RNA molecules from degradation. '467 Patent at 20:16–17; '475 Patent at 26:65–66; '422 Patent at 31:24–25. Thus, these claim phrases need no construction. To the extent any aspect of these claim phrases require clarification for a jury, however, the sole word that should be construed is "encapsulate[]." GSK's proposed construction reflects the plain and ordinary meaning of "encapsulat[ing]" to a

29

POSA—and as applied in the intrinsic record—is "enclos[ing]." PBNT, on the other hand, conspicuously avoid defining "encapsulate[]," choosing instead to rewrite the claim phrases to exclude the word "encapsulate[]" and insert extraneous limitations. PBNT's proposed construction should be set aside.

> a. **GSK's Proposed Construction Reflects The Plain And Ordinary Meaning Of "Encapsulate[]" As Understood By A POSA.**

Although the specifications of the Asserted Patents do not explicitly define "encapsulate[]," they consistently use "encapsulate[]" to mean "enclose[]." The specifications describe how "RNA is encapsulated" within lipid structures (*e.g.*, the claimed liposomes) "to protected RNA from RNase digestion." *E.g.*, '467 Patent at 1:48–2:1, 18:50–20:43, 21:7–16; '475 Patent at 3:23–33, 3:52–55,4:58–64, 25:31–27:25, 27:56–64; '422 Patent at 1:46–2:2, 29:16–31:51, 32:16–24. Moreover, the specifications explicitly and repeatedly distinguish "external," "adsorbed," or "lipoplex[ed]" RNA—which is *outside* of lipid structures—from "encapsulated" RNA, further demonstrating that the plain and ordinary meaning of "encapsulated" is "enclosed." *E.g.*, '467 Patent at 2:1–6, 13:20–25, 21:7–16; '475 Patent at 4:58–64, 19:28–33, 32:16–24; '422 Patent at 2:2–7, 14:47–49, 32:16–24; *see also* JA-008 Forrest Decl. ¶¶ 63–66.

"[E]ncapsulate[]" had a well-understood meaning to a POSA—"enclose[]"—at the time of the claimed inventions' 2010 priority date. JA-008 Forrest Decl. ¶¶ 63–64. This is reflected in the 2009 Glossary of Terms Related to Pharmaceutics ("IUPAC 2009 Glossary"), published by the International Union of Pure and Applied Chemistry, an international organization formed in 1919 with the express purpose of standardizing chemical nomenclature.[14] *See Comaper Corp. v.*

---

[14] "The International Union of Pure and Applied Chemistry *(IUPAC) is the world authority on* . . . *chemical nomenclature and terminology* . . . . Founded in 1919, IUPAC has been creating the common language of chemistry for more than a century." *Who We Are*, IUPAC, https://iupac.org/who-we-are/ (preserved Dec. 5, 2025) (attached as JA-002 Attach. 2).

*Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) (stating that, "in determining the ordinary and customary meaning of the claim term as viewed by a [POSA], it is appropriate to consult" a dictionary where "[t]he patent specification does not assign or suggest a particular definition" to a claim term).  The IUPAC 2009 Glossary defines "encapsulation" as the "[p]rocess of *enclosing* a drug *in a (micro or nano) particle* (capsule, *liposome*, polymer)."  JA-003 Attach. 3 at 984 (emphasis altered).  No additional explanation is needed for a POSA (or a jury).  *See Array BioPharma, Inc. v. Alembic Pharms. Ltd.*, 2024 WL 1637354, at *3–4 (D. Del. Apr. 16, 2024) (reasoning that "a [POSA] would be able to readily determine the meaning of those terms").

        **b.**        **PBNT's Proposed Construction Of "Encapsulate[]" Adds Unwarranted And Confusing Limitations.**

Rather than simply define "encapsulate[]," PBNT attempt to improperly rewrite the straightforward claim language to impermissibly add new words and limitations.  For example, PBNT seek to add the complicated and unnecessary phrase "present in an aqueous core separated from any external medium."  But the Asserted Claims do not include such limitations, reciting instead that the "liposomes," "lipid particles," or "lipids" "encapsulate[]" (or enclose) the RNA. *See Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001) ("[A]dding limitations to claims not required by the claim terms themselves . . . is impermissible.").  Significantly, PBNT did not apply their overly complicated and limiting proposed construction in their own invalidity contentions.  PBNT instead equated "encapsulate[]" with "enclose[]."[15]  Accordingly, the Court should reject PBNT's attempt to rewrite the straightforward claim language to depart from the well-understood meaning of "encapsulate[]."

---

[15] *E.g.*, JA-004 Attach. 4 at 19 ("Felnerova 2004 teaches that 'liposomes are . . . self-*enclosed*'" (cleaned up)); *id.* at 37 ("Pascolo 2007 . . . discloses that 'liposomes are vesicles that consist of an aqueous compartment *enclosed* in a phospholipids bilayer." (cleaned up)); *id.* at 478 ("WO '401 discloses liposomes 'having lipid-containing membranes *enclosing* an aqueous interior.'").

*See Dayco*, 258 F.3d at 1324 ("In . . . claim construction, . . . [the] objective is to interpret the claims from the perspective of [a POSA], not from the viewpoint of counsel . . . retained to offer creative arguments in . . . litigation." (cleaned up)).

The Court should thus adopt GSK's proposed construction of "encapsulat[ing]" as "enclos[ing]."

### 2.     Defendants' Answering Position

The Asserted Claims include variations of the same limitation requiring the claimed "[liposome(s)]/[lipid particles]/[lipids]" (collectively, "lipid compositions") to encapsulate the recited RNA molecule(s).  The Court should construe these limitations to require that the recited RNA is "present" "in an aqueous core separated from any external medium by the [lipid composition's] lipid bilayer."  That is what a POSA would have understood the plain and ordinary meaning to be in the context of the specifications.

### a.     The Intrinsic Record Supports PBNT's Constructions

PBNT's constructions track the specifications' description of what it means for the claimed lipid compositions to encapsulate RNA.  The specifications repeatedly instruct that the RNA is present in the aqueous core, which is encapsulated by the lipid bilayer:

> "Thus *the invention* provides a liposome having *a lipid bilayer encapsulating an aqueous core*,…wherein…*the aqueous core includes a RNA* which encodes an immunogen."

'693 Patent, 1:53:61; '694 Patent, 1:50-55; '534 Patent, 1:49-57; '401 Patent, 1:48-53; '467 Patent, 1:48-53; '422 Patent, 2:37-44.

> "Various amphiphilic lipids can form *bilayers* in an aqueous environment to *encapsulate a RNA-containing aqueous core as a liposome*."

'693 Patent, 2:12-14; '694 Patent, 2:9-11; '534 Patent, 2:8-10; '401 Patent, 2:7-9; '467 Patent, 2:7-9; '422 Patent, 2:8-10; '475 Patent, 3:31-33; '660 Patent, 3:56-68.

> "Nucleic acid immunisation is achieved by delivering *RNA encapsulated within a PEGylated liposome*….Thus the invention provides a liposome having *a lipid bilayer encapsulating an aqueous core*…."

'422 Patent at Abstract. Indeed, the applicant confirmed that the RNA is "present in the aqueous core" to the Patent Office during prosecution of one of the asserted patent families:

> Based on the description of the specification, and further amendment to the claims, it is evident that "encapsulation" requires that the *RNA be present in the aqueous "core"* of the liposome….

JA-014 Ex. 7, 6. Thus, there can be no dispute that encapsulation of RNA in the claimed lipid compositions means that the RNA is "present" in the aqueous core of the compositions.

The specifications also explain that by being *present* in the aqueous core—and, therefore, encapsulated—the RNA is "separated from any external medium by the liposome's lipid bilayer":

> *The invention* utilises liposomes in which immunogen encoding *RNA is encapsulated*. Thus the *RNA* is (as in a natural virus) *separated from any external medium by the liposome's lipid bilayer*, and *encapsulation in this way* has been found to *protect RNA* from RNase digestion.

*See, e.g.*, '693 Patent, 2:2-6; '422 Patent, 2:37-44. Notably, the specifications specifically instruct that "encapsulation in this way" protects the RNA cargo.

The specifications further explain how the lipid bilayer separates the RNA-containing aqueous core from the external medium—it forms an "outer layer around" the RNA-containing aqueous core, thereby physically separating it from the external medium:

> *RNA* is preferably *encapsulated within the liposomes*, and so the liposome forms an *outer layer around* an aqueous *RNA-containing core*. *This encapsulation* has been found *to protect RNA* from RNase digestion.

'475 Patent, 4:58-64. The Asserted Patents never describe any other structural relationship where the lipid bilayer, aqueous core, and RNA are organized differently. Thus, the specifications explain that RNA encapsulation in the claimed lipid compositions refers to the RNA being "present

in the aqueous core" of the lipid formulation such that it is "separated from any external medium" by the "lipid bilayer."  PBNT's construction uses this exact language.  *See* JA-014, ¶ 89.

Here too, the intrinsic evidence provides sufficient reason for the Court to adopt PBNT's constructions.  *See Seabed Geosolutions*, 8 F.4th at 1287.

#### b.       Extrinsic Evidence Supports PBNT's Construction

The prior art also supports that, in liposomes used for RNA delivery, the RNA is present in the aqueous core, which is physically separated from the external medium by the lipid bilayer that surrounds the aqueous core, and that such encapsulation protects the RNA.  JA-014, ¶¶ 90-92. For example, MacLachlan 2008 explains:

> The pharmacology of a liposomal formulation of NA will be largely determined *by the extent to which the NA is <u>encapsulated</u> inside the liposome bilayer(s)*.  <u>*Encapsulated*</u> *NA will be <u>protected</u>* from nuclease degradation….

JA-014 Ex. 4, 253.  MacLachlan 2008 also describes an assay for measuring encapsulation that depends on the release of the nucleic acid from the liposome, which requires disrupting the lipid bilayer:

> <u>*Encapsulation*</u> *is determined by adding the dye to a liposomal formulation*….Detergent mediated *disruption of the liposomal bilayer releases the <u>encapsulated</u> NA,* allowing it to interact with the membrane-impermeable dye.

*Id*., 254; JA-014, ¶ 91.  The specifications also describe a similar assay that requires disrupting the lipid bilayer.  *See, e.g.,* '693 Patent, 22:17-26.  This confirms that the lipid bilayer acts as a physical barrier *separating* the nucleic acid in the aqueous core from the external medium.  JA-014, ¶ 91.

#### c.       GSK's Proposed Construction Fails to Clarify What the Claim Language Means and Improperly Broadens the Claim Scope

GSK's argument that no construction is necessary conflicts with its position to replace "encapsulate" with "enclose."   In fact, GSK's proposal bypasses the specifications' clear

explanation for how RNA is *encapsulated* by the claimed lipid compositions. GSK only discusses "encapsulate" alone, but neither party proposed "encapsulate" alone for construction. Rather, PBNT proposed construing claim language reciting that *RNA is encapsulated in the claimed lipid compositions*, and proposed constructions that clarify what that full claim term means. In contrast, GSK and Dr. Forrest focus solely on the term "encapsulate" and provide no analysis for the disputed full claim term. *See e.g.*, *Supra*, 30 ("'[E]ncapsulate[]'" had a well-understood meaning to a POSA—'enclose[]'").

GSK's construction obfuscates what it means for the claimed lipid compositions to encapsulate RNA by replacing "encapsulate," a term *used at least 70 times* in each of the Asserted Patents with, "enclose," a term absent from the Asserted Patents. JA-014, ¶¶ 98-99. Replacing clear language in the specifications with new language that does not appear in the specifications and that GSK does not explain would not provide clarity, but risk confusing the jury. *See Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1381 (Fed. Cir. 2024) ("[A] claim construction…should help resolve, not add to, uncertainty in the understanding the [jury] is to use in applying a claim term.").

GSK's argument that the "specifications…consistently use 'encapsulate[]'" to mean "enclose[]" is plainly incorrect. *Supra*, 30. Rather, all the specification passages that GSK cites use the term "encapsulate," not "enclose." *Supra*, 30; JA-014, ¶ 102. Also, that the specifications distinguish "external," "adsorbed," or "lipoplex[ed]" RNA is not instructive because that description is consistent with PBNT's constructions, which require the RNA to be inside the aqueous core. JA-014, ¶ 103. In fact, GSK does not point to a single embodiment according to the asserted claims where the RNA is *not* present in the aqueous core or where the RNA-containing aqueous is *not* separated from the external medium by the lipid bilayer.

Further, as Dr. Green explains, "[t]he POSA would have understood the term 'enclose' to have broader meaning than 'encapsulate'.…"  JA-014, ¶¶ 95-97 (citing dictionary definitions). "[W]hereas 'enclose' captures any method for closing in, 'encapsulate' is just one specific way to 'enclose'—namely, to enclose in a capsule or as in a capsule."  Indeed, there is more than one way to *enclose* drugs just in liposomes.  As Dr. Green explains, hydrophilic drugs, such as RNA, are *enclosed* by *encapsulation* in the aqueous core whereas hydrophobic drugs are *enclosed* by *intercalation* in the lipid bilayer itself, which means that they are present within the hydrophobic region of the bilayer.  JA-014, ¶ 96.  For example, the FDA's 2018 Guidance for Industry on Liposome Drug Products explains that "*[e]ncapsulated* refers to drug substance within an *aqueous space* and *intercalated* refers to incorporation of the drug substance within a *bilaye*r."  JA-014 Ex. 6, Liposome Drug Products: Chemistry, Manufacturing, and Controls; Human Pharmacokinetics and Bioavailability; and Labeling Documentation Guidance for Industry at 2 (Apr. 2018).  Dr. Green explains that this was also the POSA's understanding as of the priority date.  JA-014, ¶ 96. Thus, "enclose" is broader than "encapsulate" and does not accurately reflect what it means for RNA to be encapsulated in the claimed lipid compositions.

GSK cites to an IUPAC definition for "encapsulation," but neither GSK nor Dr. Forrest explain why it supports GSK's construction over Pfizer's construction.  *Supra*, 30-31 ("the '[p]rocess of enclosing a drug in a (micro or nano) particle (capsule, liposome, polymer")) (emphasis removed).  It does not—the definition does not equate "encapsulate" with "enclose" or define it as such, but merely as one way of enclosing.  JA-014, ¶ 100.  Nor does the definition explain or clarify what it actually means to encapsulate RNA in the claimed lipid compositions as recited in the claim language at issue.  *Id*.  And even if it could be read to support GSK's

36

construction, the definition is extrinsic evidence that cannot overcome the clear intrinsic evidence support for PBNT's construction.[16]

GSK's reliance on *Dayco Products, Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001), for the proposition that "adding limitations to claims not required by the claim terms themselves…is impermissible" misses the point that the claim language itself requires the exact features in PBNT's construction, as the specifications and the prior art explain. Additionally, the proposition in *Dayco* that, "[i]n…claim construction,…[the] objective is to interpret the claims from the perspective of [a POSA], not from the viewpoint of counsel…retained to offer creative arguments in…litigation," *Dayco*, 258 F.3d at 1324, is *precisely* why the Court should adopt PBNT's construction over GSK's construction. As explained above, PBNT's construction tracks Novartis's original description of what it means for the claimed lipid formulations to encapsulate RNA, whereas GSK's construction, which introduces wholly new language absent from the specification, is a litigation-driven attempt to broaden the claim scope and ensnare technology that the specifications do not contemplate.

GSK's statement that "PBNT…equated 'encapsulate[]' with 'enclose[]'" in their invalidity contentions is incorrect. *Supra*, 31. PBNT did not equate "enclos[e]" with "encapsulate." "Enclose" appears in the quoted text of less than a handful of the 79 prior art references that PBNT cites. Since "encapsulation" is a specific way of enclosing a drug, JA-014, ¶ 95, it is not surprising that "enclose" sometimes appears in the art. Also, GSK ignores PBNT's cited art where the term "encapsulate" is used in the specific context of liposomes.

---

[16] GSK's citation to *Comaper Corp. v. Antec, Inc.*, 596 F.3d 1343, 1348 (Fed. Cir. 2010) to justify its reliance on extrinsic evidence, *supra*, 30-31, is not persuasive because, unlike in *Comaper Corp.,* the specifications here explain clearly what encapsulating RNA in the claimed lipid composition means.

### 3.    Plaintiff's Reply Position

#### a.    GSK's Proposed Construction Reflects The Plain And Ordinary Meaning Of "Encapsulate[]."

GSK's construction reflects the plain and ordinary meaning of the "encapsulate[]" terms, using a term likely more familiar to the jury:  "enclose[]."  PBNT fails to identify anything in the intrinsic or extrinsic record that contradicts GSK's construction.

PBNT's suggestion that GSK's construction "broadens" the claim scope is incorrect. According to PBNT and its expert Dr. Green, "enclose[]" is "broader" than "encapsulate[]."  *See* Section III(B)(2)(c) at 35–38.  But PBNT's evidence for that argument—extrinsic evidence from 2018—proves GSK's point:  in the context of the claims, "enclose[]" and "encapsulate[]" share the same meaning.  *Id.*, Ex. 6.  The parties and their experts agree that mRNA is a "hydrophilic drug."  *See* JA-014 Green Decl. ¶96; JA-009 Forrest Reply Decl. ¶¶104–13.  Because it is the mRNA that the claims require to be "encapsulate[d]," *e.g.*, '467 Patent, Claim 1; '660 Patent, Claim 1; '475 Patent, Claim 1, the Asserted Patents do not, as PBNT argues, pertain to or claim "encapsulation" by "intercal[ation]," which applies only to hydrophobic drugs.  *See* Section III(B)(2)(c) at 36.  Accordingly, no credible dispute exists that the hydrophilic mRNA is "enclosed" within the claimed lipid delivery vehicle.

#### b.    PBNT's Proposed Construction Of "Encapsulate[]" Improperly Rewrites The Claims To Exclude An Embodiment.

PBNT's construction impermissibly adds limitations "not required by the claim term[s] themselves."  *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1327 (Fed. Cir. 2001). The asserted claims require "at least half" of the mRNA to be "encapsulated" within the lipid delivery system—without limitation to any particular internal morphology or location.  But under PBNT's construction, to be "encapsulated," the mRNA must be in what PBNT has defined as "***the***" one and only "aqueous core."  Section III(B)(2)(a) at 12–15, 32–34; *see supra* Part

III(A)(3)(b).  That proposal violates at least three fundamental claim construction principles and should accordingly be rejected.

*First*, PBNT's proposed construction would improperly import an "aqueous core" limitation from the specifications (albeit, one that reads PBNT's improper implicit limitation into the specification) to narrow the otherwise plain claim language.  The Federal Circuit has made clear, however, that "***a particular embodiment appearing in the written description may not be read into a claim when the claim language is broader than the embodiment***."  *Resonate Inc. v. Alteon Websystems, Inc.*, 338 F.3d 1360, 1264-65 (Fed. Cir. 2003); *see also Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012).  Although the specifications acknowledge that liposomes contain "an aqueous core," "an aqueous RNA-containing core," and "aqueous compartments" (*e.g.*, '467 Patent at 2:7–9, 3:17–22; '475 Patent at 3:53–55, 4:34–39), the "encapsulate" limitations do not recite those compartments, and certainly not in the manner that PBNT would have the Court understand them (*i.e.*, a single central core).  Even without the inclusion of "aqueous core," the "encapsulate[]" limitations clearly capture one aspect of the invention—to enclose the mRNA in a lipid delivery system to protect it from degradation.

*Second*, PBNT's proposed construction is further improperly limiting because it requires "***the*** aqueous core," specifically, to encapsulate "at least half of the mRNA molecules."  *See* Section III(B)(2)(a) at 12–15, 32–34.  Again, nothing in the claims or specifications requires that mRNA be encapsulated in any particular aqueous core, much less the single, centrally located one that PBNT advocates.  *Supra* Part I.B.  Moreover, as noted, PBNT's proposed construction would improperly exclude certain MLV embodiments, such as one with 30% of the mRNA in one aqueous compartment, 30% in another aqueous compartment, and 30% in a third aqueous compartment.  Whether concentric or non-concentric, all those "cores" and the mRNA within are

"encapsulated" and protected from degradation by one or more lipid bilayers.  JA-009 Forrest Reply Decl. ¶¶96-98, 104–13, 137; '467 Patent at 20:16–17; '475 Patent at 26:65–66.  Yet, under PBNT's construction, that MLV would nevertheless fail to meet the "encapsulate[]" "at least half" claim requirement because only 30% of the mRNA was encapsulated within the inner-most aqueous core, specifically.

*Third*, PBNT's proposed construction would create unnecessary ambiguity and complexity, requiring a jury to distinguish between various cores to decide which is the inner-most, centrally-located core and then determine what percentage of mRNA is contained by that core—none of which is required by the plain claim language.  *See Promptu*, 92 F.4th at 1381. And, as established earlier, the real-world morphologies of the liposomes formed using the referenced methods bear little resemblance to PBNT's cartoons.

Accordingly, the Court should reject PBNT's attempt to read its "aqueous core" limitation into the encapsulation terms.

### 4.    Defendants' Sur-Reply Position

The question before the Court is: what does it mean for the RNA to be encapsulated in the claimed lipid compositions?  Dr. Forrest (and presumably GSK) now agrees with the language "separated from any external medium by the lipid composition's lipid bilayer" in PBNT's construction.  But GSK still disputes that the RNA must be in the "aqueous core," arguing instead that it must merely be in an "aqueous compartment."  *Supra*, 39-40.  This position contradicts the specification, which only describes the "RNA … [a]s encapsulated in the liposome's [aqueous] core."  '422 Patent, 2:2-5; *see also id.*, Abstract; *supra*, 32-34; JA-015, ¶¶74-75.  GSK confirmed this during prosecution: "it is evident that *'encapsulation' <u>requires</u> that the RNA be present in <u>the aqueous 'core'</u>* of the liposome."  *See supra*, 33 (citing JA-014 Ex. 7 at 6).  GSK and Dr. Forrest ignore this admission to the PTO.

GSK argues that PBNT's construction would "import an 'aqueous core' limitation from the specifications" and require the aqueous core to encapsulate at least half of the mRNA molecules. *Supra*, 39. GSK contends, therefore, that PBNT's construction excludes "certain MLV embodiments" with RNA in different "aqueous compartments." *Supra*, 39-40. But the specifications never describe embodiments with RNA in any aqueous compartment other than "the aqueous core," let alone GSK's hypothetical 30%/30%/30% MLV with RNA in three different aqueous compartments. JA-015, ¶75. Rather, RNA is *always* described as encapsulated in "[an]/[the] aqueous core."[17]

GSK's argument that PBNT's construction "would create unnecessary ambiguity and complexity, requiring a jury to distinguish between *various cores* to decide which is the innermost, centrally-located core and then determine what *percentage of mRNA is contained by that core*" is also incorrect. *Supra*, 40. As explained in SectionIII.A.2.a and III.A.4.b, the specifications and prosecution history make clear that the claimed lipid compositions have just one aqueous core, so there is no ambiguity or confusion. Nor is there any difficulty in identifying the "innermost, centrally-located core." *Supra*, 13 (clearly showing the aqueous core of an MLV). And "determin[ing] what percentage of mRNA is contained by that core," *supra*, 40, is a matter of infringement and not probative of the correct construction.

### C.  "BY ELICITING AN ANTIBODY RESPONSE AGAINST THE IMMUNOGEN IN VIVO"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "by eliciting an antibody response against the immunogen in vivo" | No construction necessary: Plain & ordinary meaning, *i.e.*: by eliciting an antibody response against the immunogen in vivo | by eliciting an antibody response against the immunogen encoded by the RNA in vivo |

---

[17] GSK's cited authority, *supra*, 39, is inapplicable because encapsulation of RNA *in the aqueous core* is the *only* embodiment described in the specification.

41

| U.S. Patent No. 11,786,467 (All asserted claims) | | |
| --- | --- | --- |
|  | | |

GSK's Op. CC Brief, 14-15.

### 1.   Plaintiffs' Opening Position

No construction is necessary for this straightforward claim phrase. PBNT's proposed construction uses the verbatim claim language but inserts the words "encoded by the RNA." But no need exists to clarify that the claimed "immunogen" is encoded by the RNA, as PBNT seem to suggest. The claim language already recites that aspect of the claimed invention. For example, Claim 1 of the '467 Patent recites: "[a] formulation comprising ***ribonucleic acid (RNA) molecules*** comprising a sequence ***that encodes an immunogen*** . . . wherein the formulation is immunogenic in vivo by eliciting an antibody response against the immunogen in vivo." Adopting PBNT's proposed construction would only serve to create redundant ambiguity that would confuse the jury. Because the plain and ordinary meaning of the term is straightforward from the language of the claims themselves, no construction is necessary. *See, e.g.*, *Par Pharm., Inc. v. Baxter Healthcare Corp.*, 2024 WL 4100255, at *6 (D. Del. Sept. 6, 2024), *adopted sub nom.*, *Endo USA, Inc. v. Baxter Healthcare Corp.*, 2024 WL 4791229 (D. Del. Nov. 14, 2024) ("Because the plain and ordinary meaning of the term is apparent from the language of the claims themselves, no construction is needed . . . ."); *Am. Patent Dev. Corp. v. Movielink, LLC*, 604 F. Supp. 2d 704, 716 (D. Del. 2009) (refusing to adopt a construction which was "merely a verbose paraphrasing of the claim language that otherwise offers little to assist one of skill in the art in understanding the claims").

### 2.     Defendants' Answering Position

The disputed claim language in claim 1 of the '467 Patent (discussed in this section) and the disputed claim language in pending claim 16 of U.S. Publication No. 20220125722 (the "'722 Publication"), which issued as the '467 Patent (discussed Section III.D), relate to GSK's assertion that it is entitled to provisional rights back to the publication date of the '722 Publication. Provisional rights allow a patent holder to seek damages for pre-issuance acts of infringement that occurred after their patent application published, *provided*, *inter alia*, the published claim(s) are "substantially identical" to the issued claim(s).[18] *See* 35 U.S.C. § 154(d)(2). Here, GSK argues, incorrectly, in its infringement contentions that published claim 16 of the '722 Publication is substantially identical to issued claim 1 of the '467 Patent. JA-010, 1.

When properly construed these claims are *not* substantially identical because the scope of issued claim 1 is *substantively narrower* than the scope of published claim 16. *Infra* § III..D. As explained below, issued claim 1 recites at least two limitations absent from published claim 16— both claims require an "antibody response," but issued claim 1 also requires the "antibody response" to be (1) "in vivo" and (2) "against the immunogen" *encoded by the RNA*. Published claim 16 lacks those two limitations and is thus broader under fundamental claim-construction principles. PBNT's constructions clarify these substantive differences and establish that the claims are not substantially identical. PBNT requests that the Court (1) adopt its constructions and (2) rule that claim 1 of the '467 Patent and claim 16 of the '722 Publication are not substantially identical.[19]

---

[18] Claims are substantially identical if they are "without substantive change." *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1346 (Fed. Cir. 1998) (citation omitted). "Furthermore, in determining whether substantive changes have been made, we must discern whether the scope of the claims are identical, not merely whether different words are used." *Id.* (citations omitted).

[19] Whether claims are substantially identical compares claim scope and thus is an issue of law that this Court can resolve now. *See Laitram Corp.*, 163 F.3d at 1347 ("the interpretation and

Regarding issued claim 1, PBNT's construction makes clear that the claimed formulation must elicit an "antibody response" against the "immunogen" *encoded by the RNA* that is recited earlier in the claim.  That is required because the only antecedent basis for "the immunogen" is the antecedent "an immunogen" encoded by the RNA:

> A formulation comprising:
>
> ribonucleic acid (RNA) molecules comprising a sequence that encodes *an immunogen*; and…
>
> wherein the formulation is immunogenic in vivo by eliciting an antibody response against *the immunogen* in vivo;….

'467 Patent, claim 1.  GSK agrees, explaining that "[t]he claim language already recites that aspect of the claimed invention," *supra*, 42, but opposes PBNT's construction because it would "create redundant ambiguity that would confuse the jury."  *Id*.  GSK is incorrect.  The language, "encoded by the RNA," in PBNT's construction clarifies the scope of "the immunogen" because it makes *explicit* what the jury would otherwise need to *infer* from the relationship between "*an* immunogen" and "*the* immunogen.  The Court should adopt PBNT's construction or at least hold that the formulation must elicit an antibody response against the immunogen *encoded by the RNA* in vivo.

### 3.      Plaintiff's Reply Position

PBNT asks the Court to inject the phrase "encoded by the RNA" into the straightforward claim language "by eliciting an antibody response against the immunogen in vivo."  PBNT proposes that construction not to resolve any ambiguity or actual dispute about what that phrase

---

construction of patent claims….is a matter of law, exclusively for the court") (internal quotations omitted)(citing *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc).

means but to manufacture a supposed difference between claim 1 of the '467 Patent and published claim 16 of the '722 Publication to avoid provisional rights liability.

PBNT's sole rationale for its proposed construction is to "make[] explicit what the jury would otherwise need to infer from the relationship between 'an immunogen' and 'the immunogen.'" Section III(C)(2) at 44. But that relationship is already explicit on the face of claim 1, as both sides agree that the claim makes clear that the "antibody response" is "elicit[ed]" against the "immunogen" that—as recited earlier in the claims—is encoded by the RNA. Section III(C)(2) at 43–44.

PBNT's request that the Court rule on the provisional rights issue is premature. III(C)(2) at 43. Courts have determined that provisional rights questions of substantial identity of published and issued claims should be decided after claim construction because that determination "may be impacted by the Court's claim construction ruling." *Arendi Holding Ltd. v. Microsoft Corp.*, 2010 WL 1050177 at *9 n.14 (D. Del. Mar. 22, 2010); *see also Artemi Ltd. v. Safe-Strap Co., Inc.*, 947 F. Supp. 2d 473, 478 (D.N.J. 2013) ("[W]hether the claims are substantially identical is most appropriately decided ***after*** claim construction…."). Indeed, PBNT does not cite a single case where the issue of provisional rights was addressed ***during*** claim construction. In any event, the provisional rights analysis does not turn on whether the provisional and issued claims use identical language, as PBNT suggests. III(C)(2) at 44; *Slimfold Mfg. Co., Inc. v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987) ("[I]t is the scope of the claim that must be identical, not that identical words must be used.").

Accordingly, the Court should reject PBNT's proposed construction and apply the claims' plain and ordinary meaning. If the Court opts to address the provisional rights issue during claim construction, GSK requests the Court adopt its construction and determine that the claims are

substantially identical.  As discussed in Part IV, *infra*, the specification and claim dependency make clear that '467 Patent claim 1 and '722 Publication claim 16 have substantially identical scope.

### 4.        Defendants' Sur-Reply Position

#### a.        Ruling on Provisional Rights Is Not Premature

GSK lacks provisional rights unless it can show, among other things, that the relevant claims-at-issue are *identical in scope*.  *Supra*, 45; *Slimfold Mfg. Co., v. Kinkead Indus., Inc.*, 810 F.2d 1113, 1116 (Fed. Cir. 1987) ("[I]t is the *scope of the claim that must be identical*, not that identical words must be used.").  That is purely a question of claim construction that turns on whether the scopes of Claim 1 of the '467 Patent and Claim 16 of the '722 Publication are identical. *Supra*, 43 n.19.  The Court can make these determinations based on the current record.  No further inquiry is needed.  Nor does GSK provide any reason to delay such a ruling.[20]  Ruling on provisional rights now would simplify the case and clarify the scope of any potential damages.

The claim scopes here are not identical because Claim 1 of the '467 Patent is narrower than Claim 16 of the '722 Publication: Claim 1 requires an antibody response (1) against the immunogen *encoded by the RNA* and (2) *in vivo*.  Claim 16 is broader because it lacks these limitations.

#### b.        There Is No Actual Claim Construction Dispute

GSK agrees that PBNT's construction of issued Claim 1 is correct: "[B]oth sides agree that the claim makes clear that the 'antibody response' is 'elicit[ed]' against the 'immunogen' that—as recited earlier in the claims—*is encoded by the RNA*."  *Supra*, 45.  Thus, Claim 1 *undisputedly requires* an antibody response against the immunogen *encoded by the RNA*.

---

[20] *Arendi Holding Ltd*. and *Artemi Ltd.*, are consistent with ruling on substantial identity once the relevant claim language is construed.

### D.   "ELICITS AN ANTIBODY RESPONSE"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "elicits an antibody response" <br><br> U.S. Patent Publication. No. US2022/0125722 (Claim 16) | No construction necessary: Plain & ordinary meaning, *i.e.*: <br> elicits an antibody response | "elicits an antibody response against any immunogen in vivo, ex vivo, or in vitro" |

### 1.   Plaintiff's Opening Position

No construction is necessary for this straightforward claim phrase. PBNT's proposed construction again uses the verbatim claim language but inserts additional, unnecessary words. First, no need exists to insert the words "in vivo" (i.e., in a living organism) because a POSA readily understands that Claim 16 is directed to vaccines that elicit an antibody response *in vivo*. '722 Pub. at Claim 15 ("The formulation of claim 1, wherein the formulation is immunogenic in vivo."); *id.* at Claim 16 ("The formulation of claim 15, wherein the formulation elicits an antibody response."). For the same reason, no basis exists to add the words "ex vivo" (i.e., outside a living organism) or "in vitro" (*e.g.,* in a test tube) to the otherwise plain claim language. The claimed inventions are not directed to applications outside of a living organism. Indeed, the specifications provide numerous examples of observed antibody responses in living organisms, and none outside of living beings. *See, e.g.,* '722 Pub. at [0187–0199], [0233–0241], [0246–0269]. Therefore, PBNT's proposed construction should be rejected, and no construction is needed.

### 2.   Defendants' Answering Position

PBNT's construction clarifies that the elicited "antibody response" in claim 16 of the '722 Publication (1) can be against *any* immunogen (i.e., not required to be against the antecedent "immunogen" that is encoded by the RNA) and (2) can be ex vivo or in vitro (i.e., not required to

47

be "in vivo").[21]  Therefore, published claim 16 is substantively broader than issued claim 1.  GSK

does not contest in its Opening Brief that the antibody response recited in published claim 16 can

be against *any* immunogen.  However, GSK's purported plain and ordinary meaning improperly

reads an "in vivo" limitation into the claim.  *See Supra*, 47.  The Court should adopt PBNT's

construction, which is the plain reading of the claim language as the POSA would have understood

it.

Claim 16 of the '722 **Publication** depends from claim 15, which depends from claim 1 and

therefore includes all the limitations of claims 1 and 15:

> **Claim 1.**  A *formulation* comprising:
>
> ribonucleic acid (RNA) molecules comprising a sequence that encodes an immunogen; and….
>
> **Claim 15**. The *formulation* of claim 1, wherein the formulation is immunogenic in vivo.
>
> **Claim 16.** The formulation of claim 15, wherein *the formulation elicits an antibody response*.

As the plain claim language shows, published claim 16 merely requires the "formulation" to elicit

"an antibody response"—it recites no additional requirements regarding the "antibody response."

### a.    "*Any* Immunogen"

Claim 16 does not require the elicited "antibody response" to be against the "immunogen"

encoded by the RNA that is recited in independent claim 1; rather, it can be against *any*

immunogen, including any of the components of the claimed formulation—i.e., (1) RNA

molecules; (2) protein encoded by the RNA molecules; (3) tertiary amine cationic lipid; (4) PEG-

---

[21] "In vivo" means inside the body (e.g., administering a drug to a patient).  "Ex vivo" means outside the body (e.g., working with tissues or organs outside of the body). "In vitro" also refers to work done outside the body, but usually refers to refer to work performed on isolated cells (e.g., cells in a test tube).

conjugate lipid; or (5) cholesterol. And because claim 16 recites "comprising," the claimed formulation may have *any number* of additional components that the elicited antibody response can be against. GSK does not challenge this aspect of PBNT's construction in its OB. Therefore, the Court should adopt the "against any immunogen" language in PBNT's construction.

**b.    "in vivo, ex vivo, or in vitro"**

Claim 16 does not require the recited "antibody response" to be "in vivo;" rather, it can be ex vivo or in vitro. GSK argues "plain and ordinary meaning." When PBNT asked GSK to explain its plain and ordinary meaning, GSK refused, stating that it would not use "adjectives" or "other language" to explain its proposed meaning. GSK revealed for the first time in its Opening Brief that its purported "plain and ordinary meaning" actually reads a whole new "in vivo" limitation into the recited "antibody response" that GSK *refused to disclose* prior to briefing. *See Supra*, 47 ("[N]o need exists to insert the words 'in vivo'…because a POSA readily understands that Claim 16 is directed to vaccines that elicit an antibody response in vivo.").[22] This gamesmanship is reason enough to reject GSK's construction.

GSK's construction should also be rejected on the merits. As an initial matter, the plain claim language of published claim 16 does not expressly require the "antibody response" to be "in vivo." GSK appears to suggest that the reference to "in vivo" regarding the "is immunogenic" element in claim 15 also requires the separate "antibody response" element in claim 16 to be in vivo, *see supra*, 47 (quoting claim 15), but does not explain why that is. The plain language of claims 15 and 16 shows that is incorrect. Claim 16 *does not* relate the "eliciting an antibody response" limitation back to the separate limitation in claim 15 requiring that "the formulation is immunogenic in vivo." The use of "an" in "elicits *an* antibody response" confirms that it is a

---

[22] To the extent that GSK is now *also* importing a separate "vaccine" limitation into claim 16 under its purported "plain and ordinary meaning," GSK offers no support.

49

distinct limitation unrelated to prior limitations.  Also, issued claim 1 shows that when the applicant intended to relate the "antibody response" limitation back to the "immunogenic" limitation, it did so explicitly: "wherein the formulation is *immunogenic in vivo <u>by</u> eliciting an antibody response* against the immunogen *in vivo*." '467 Patent, Claim 1.  No linking language, such as "by," is present in published claim 16.

If anything, the fact that the Applicant chose to use "in vivo" to limit the "is immunogenic" element in claim 15, but omitted that language with regard to the "elicits an antibody response" element in claim 16 confirms that the latter is not limited to "in vivo."

The prosecution history further supports PBNT's position.  During prosecution, then-pending claim 1, which recited "elicits an antibody response" with no "in vivo" limitation was limited by an examiner's amendment following an interview with the applicant to require that the formulation "is immunogenic *in vivo* by eliciting an antibody response against the immunogen *in vivo*.":

> 1.    (Currently Amended) A formulation comprising:
> ribonucleic acid (RNA) molecules comprising a sequence that encodes an immunogen; and
> lipids comprising a tertiary amine cationic lipid, a polyethylene glycol-conjugated (PEG-conjugated) lipid, and cholesterol;
> wherein the formulation is immunogenic *in vivo* by eliciting ~~elicits~~ an antibody response against the immunogen *in vivo*;
> wherein the lipids encapsulate at least half of the RNA molecules.

U.S. Application No. 17/560,019 ("'019 Application"), 01/23/2023 Notice of Allowance, 2.  The amendment resulted in the Examiner dropping his obviousness rejections and allowing the amended claim, *id*., which indicates that the amendments, including the second "in vivo" term,

materially narrowed the claim scope of the pending claim.[23] *See Laitram Corp. v. NEC Corp.*, 163 F.3d 1342 at 1348 (Fed. Cir. 1998) ("Most significantly…the addition of the 'type quality' limitation, along with the other amendments, resulted in the allowance of claims that had been rejected in the reexamination proceeding over prior art;  this is a highly influential piece of prosecution history….[i]t is difficult to conceive of many situations in which the scope of a rejected claim that became allowable when amended is not substantively changed by the amendment….").

Moreover, GSK's theory that "Claim 16 is directed to vaccines that elicit an antibody response *in vivo*," even in the absence of the "in vivo" language, would render the use of "in vivo" to describe the "antibody response" in issued claim 1—"eliciting an antibody response against the immunogen in vivo"— superfluous.  *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim"—no language is "merely superfluous").  That is especially improper in view of the addition of the "in vivo" term just prior to allowance.

Therefore, the Court should also adopt the "in vivo, ex vivo, or in vitro" language in PBNT's construction.

### 3.    Plaintiff's Reply Position

For "elicits an antibody response," PBNT once again does not identify any claim ambiguity or actual dispute.  Rather, PBNT seeks to inject new terms to improperly broaden the claim scope to avoid provisional rights liability.  "[E]licits an antibody response" is straightforward and needs no construction.

---

[23] In allowing the claims, the Examiner explained that "[t]he prior art does not teach…the superior ability of a composition *to elicit an antibody response against an immunogen in vivo* with a formulation" having the recited features.  '019 Application, 01/23/2023 Notice of Allowance, 9.

### a.    "*Any* immunogen"

PBNT argues that the antibody response of claim 16 can be against "*any* immunogen (i.e., not required to be against the antecedent 'immunogen' that is encoded by the RNA." III(D)(2) at 47 (emphasis original). That construction lacks support. PBNT disregards the canons of claim dependency and antecedent basis, proposing a construction that ignores elements recited in the claims from which claim 16 depends. *See* 35 U.S.C. § 112(d) ("A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers."). Claim 16 depends from claim 1, which recites "ribonucleic acid (RNA) molecules comprising a sequence that encodes an immunogen." Because claim 1's immunogen is the antecedent to the immunogen recited in claim 16, claim 16's antibody response results from the immunogen required by claim 1. Thus, PBNT's construction—that would include an antibody response against **any** immunogen—improperly broadens dependent claim 16 beyond independent claim 1. *See, e.g., Littlefuse, Inc. v. Mersen USA EP Corp.*, 29 F.4th 1376, 1380 (Fed. Cir. 2022) ("By definition, an independent claim is broader than a claim that depends from it….").

Nor does PBNT's proposed construction find any support in the specification. The specification describes an antibody response against **only** the immunogen encoded by the mRNA. *See, e.g.*, '722 Publication at [0187]–[0188], [0192], [0194], [0196]–[0199], [0232]–[0238], [0243]–[0259], [0261]–[0264], [0266]–[0268], [0270]–[0276], FIGS. 7–9, 11–12, 14, 16–18. PBNT does not identify any intrinsic evidence to support that claim 16 encompasses an antibody response to any immunogen. As the claim is written, the sole antibody response supported by the specification is against the immunogen encoded by the mRNA.

### b.    "In vivo, ex vivo, or in vitro"

PBNT's position that the antibody response of claim 16 can be *in vivo*, *ex vivo*, or *in vitro* violates fundamental patent law, namely that a dependent claim includes each and every element

of the claim(s) from which it depends. *See* 35 U.S.C. § 112(d); *Littlefuse*, 29 F.4th at 1380. Claim 16 depends from claim 15, which explicitly recites that the "formulation of claim 1, wherein the formulation is immunogenic *in vivo*." Claim 16 further recites "wherein the formulation elicits an antibody response." As explained in the Joint Technology Tutorial, an antibody response is elicited *in vivo* upon exposure to an immunogen. Analogously, claim 17, which also depends from claim 15, requires a cell-mediated immune response—the other type of *in vivo* response elicited upon exposure to an immunogen. *See e.g.*, '722 Publication at [0187]–[0188], [0192], [0194], [0196]–[0201], [0232]–[0240], [0243], [0246]–[0276], FIGS. 7–9, 11–14, 16–19. Neither claim 16 nor any claim from which it depends recites any *ex vivo* or *in vitro* immune response and, for that reason alone, those limitations should not be imported into the claim. And even if the immunogen were to elicit an immune response *ex vivo* or *in vitro* as well, that cannot supplant ("in vivo, ex vivo, *or* in vitro") the *in vivo* antibody response requirement of claim 15. PBNT's argument that claim 16 should be construed without reference to claim 15—from which it depends—should be set aside. Section III(D)(2)(b) at 49–50.[24]

Further, PBNT argues that the Examiner's amendment adding the *in vivo* linking language to '467 Patent claim 1 supports its construction of claim 16 because the addition of the *in vivo* requirement materially narrowed the claim and resulted in allowance. Section III(D)(2)(b) at 50–51. That is exactly GSK's point. The elements introduced into '467 Patent claim 1 by the amendment are the elements recited in '722 Publication claims 15 and 16. Thus, if anything, the

---

[24] According to PBNT, '467 Patent claim 1 includes language linking the antibody response directly to the *in vivo* requirement of claim 15 while, per PBNT, claim 16 supposedly does not, which PBNT reasons means the antibody response is not limited to *in vivo*. Section III(D)(2)(b) at 49–50. Even if claim 16 lacks a link (which it does not), the claim language and the specification make clear that it encompasses an *in vivo* antibody response against the immunogen encoded by the mRNA. *See Convolve, Inc. v. Compaq Comput. Corp.*, 812 F.3d 1313, 1322–23 (Fed. Cir. 2016).

prosecution history shows that the scope of '467 Patent claim 1 and '722 Publication claim 16 are the same.

### 4.    Defendants' Sur-Reply Position

To properly construe the claim scope and resolve the parties' provisional-rights dispute, the Court should also find that the "antibody response" in Claim 16 of the '722 Publication can be against "[1] any immunogen [2] in vivo, ex vivo, or in vitro," making it broader than Claim 1 of the '467 Patent.

### a.    "*Any* Immunogen"

Claim 16 of the '722 Publication simply recites that "the formulation elicits an antibody response." It does not contain the limitations discussed above in Claim 1 of the '467 Patent that specifically require an antibody response *against the immunogen encoded by the RNA*. Thus, on its face, Claim 16 of the '722 Publication is broader: It covers formulations that elicit an antibody response against *any* immunogen, including other immunogens that are not encoded by the RNA. Indeed, GSK does not dispute that other components of the claimed formulation can elicit an antibody response. *Supra*, 52. Nothing in Claim 16 excludes a formulation that elicits an antibody response against those other components.

GSK did not contest this aspect of PBNT's construction in its Opening Brief, *see supra*, 47, but reversed course in its Reply Brief. *Supra*, 52. GSK's new argument that "PBNT disregards the canons of claim dependency and antecedent basis," *supra*, 52, misinterprets PBNT's construction. First, PBNT's construction does not "improperly broaden[] dependent claim 16 beyond independent claim 1" of the '722 Publication. *Id*. Dependent Claim 16 is *necessarily narrower* than Claim 1 (and 15) under PBNT's construction because Claim 16 requires the claimed formulation to elicit an "antibody response," whereas Claims 1 and 15 do not. Therefore, there is no improper dependency.

Second, GSK misstates the claims by arguing that "[b]ecause claim 1's *immunogen is the antecedent* to the *immunogen recited in claim 16*, claim 16's antibody response results from the immunogen required by claim 1." *Id*. Claim 16 does *not recite* an "immunogen" and thus does not refer back to the immunogen encoded by the RNA recited in Claim 1. Therefore, claim 1's immunogen is not the antecedent to any element in Claim 16. Rather, the additional Claim 16 limitation—"elicits an antibody response"—is a standalone limitation introduced for the first time in Claim 16, as confirmed by the use of "an." Thus, the "antibody response" in Claim 16 has no antecedent basis in Claim 1.

### b.    "In Vivo, Ex Vivo, or In Vitro"

Claim 16 of the '722 Publication also does not recite that the "antibody response" is "in vivo." Thus, on its face, Claim 16 of the '722 Publication is broader: It covers formulations that elicit an antibody response in any setting—in vivo, as well as ex vivo and/or in vitro. Indeed, GSK does not appear to dispute that an antibody response can be elicited ex vivo and/or in vitro.

GSK's argument that PBNT's position violates 35 U.S.C. § 112(d), *supra*, 52-53, misstates PBNT's construction. Claim 16, as construed by PBNT, *does* "include[] each and every element of the claim(s) from which it depends," including Claim 15. *Id.* GSK identifies no element of Claim 15 that PBNT's construction fails to capture. Nor does PBNT's construction "import[]" "ex vivo" and "in vitro" *limitations* into the claims, as GSK asserts. *Id.* Rather, the opposite is true—PBNT's construction clarifies that the recited antibody response is *not limited* to "in vivo," but can be in *any context* (in vivo, ex vivo, or in vitro).

GSK's argument that Claim 16 must incorporate "the *in vivo antibody response requirement of claim 15*," *id.*, misstates the claims because Claim 15 does not require an antibody

55

response.[25]  If it did, then Claim 16, which only further requires "elicit[ing] an antibody response," would be *superfluous* of Claim 15 and violate §112(d)'s requirement that "[a] claim in dependent form shall…specify a *further limitation* of the subject matter claimed."

In footnote 4, GSK misstates PBNT's argument.  PBNT does not suggest any link between issued Claim 1 and published Claim 15.  Rather, PBNT contrasts the linking language "by" in issued Claim 1 with the absence of any linking language in published Claim 16 to show that the "antibody response" in published Claim 16 is a separate, standalone limitation.  *Supra*, 50.  GSK argues that Claim 16 does have a link, but GSK identifies no linking language.  *Supra*, 53 n.24.

GSK speculates that "the elements introduced into '467 Patent claim 1 by the amendment are the elements recited in '722 Publication claims 15 and 16," without citing the prosecution history.  *Supra*, 53.  Published Claim 16 *never recited* the "in vivo" element added to qualify the "antibody response" limitation.  Therefore, the "in vivo" limitation as to the "antibody response" in issued Claim 1 of the '467 Patent could not have come from published Claim 16.  Nor could it have come from Claim 15, which does not require an "antibody response," let alone an "in vivo" one.  That is exactly the point—the added "in vivo" limitation qualifying the "antibody response" narrowed issued Claim 1 relative to published Claim 16.

### E. "AT LEAST TWO UNIT DOSES BEING SEQUENTIAL AND AT LEAST 1 WEEK APART" / "AT LEAST TWO UNIT DOSES BEING SEQUENTIAL AND ADMINISTERED AT LEAST 1 WEEK APART"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "at least two unit doses being sequential and at least 1 week apart" | No construction necessary: Plain & ordinary meaning, *i.e.*: | at least two unit doses being administered according to a multiple unit dose schedule at least 1 week apart |

---

[25] The Claim 15 composition can be "immunogenic" by eliciting a "cell-mediated immune response," as required in Claim 17 of the '722 Publication (depending from Claim 15).

| U.S. Patent No. 11,655,475 (All asserted claims) | at least two unit doses being sequential and at least 1 week apart | |
|---|---|---|
| AND | AND | |
| "at least two unit doses being sequential and administered at least 1 week apart" | at least two unit doses being sequential and administered at least 1 week apart | |
| U.S. Patent No. 11,851,660 (All asserted claims) | | |

GSK's Op. CC Brief, 16-17.

### 1.    Plaintiff's Opening Position

These claim phrases are straightforward and therefore need no construction.  The claim phrases require "at least two unit doses being sequential" and "at least 1 week apart."  They are plain English and easily understood by a jury.  *See Summit 6, LLC, v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) ("[E]ach [term] is used in common parlance and has no special meaning in the art. Because the plain and ordinary meaning of the disputed claim language is clear, the district court did not err by declining to construe the claim term.").

PBNT seek to complicate the otherwise straightforward claim language by replacing the term "sequential" with the phrase "being administered according to a multiple unit dose schedule." The Court should reject PBNT's improper attempt to add the extraneous limitation "multiple unit dose schedule" in place of the otherwise clear claim language.  *See Rsch. Corp. Techs. v. Gensia Lab'ys, Inc.*, 10 F. App'x 856, 860 (Fed. Cir. 2001) ("[I]t is improper for a court to add extraneous limitations to a claim that are added wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.").  Moreover, while a juror will understand what a common word like "sequential" means, PBNT's overly technical jargon—"multiple unit dose

57

schedule"—will only create complexity and potential confusion. *See Power-One, Inc. v. Artesyn Techs., Inc.*, 599 F.3d 1343, 1348 (Fed. Cir. 2010) ("The terms, as construed by the court, must 'ensure the jury fully understands the court's claim construction rulings and what the patentee covered by the claims.'" (quoting *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004))). Accordingly, no construction is necessary, and PBNT's proposed construction should be rejected.

### 2.    Defendants' Answering Position

PBNT's construction requires the claimed "at least two unit doses" to be administered according to a "multiple unit dose schedule"—a description of the claimed embodiment that comes directly from the specifications. Importantly, PBNT's construction gives meaning to the claim term "sequential" by clarifying that the multiple unit doses must be part of the *same dose schedule* (as opposed to *separate and unrelated single unit dose schedules*). GSK's position is that "no construction is necessary" because the claim language is "straightforward," but it has not explained what the language means. Since GSK disputes PBNT's construction, GSK presumably reads the claims to cover multiple unit doses that are not part of the same dose schedule (e.g., unrelated doses having separate single unit dose schedules and administered years apart). That reading is inconsistent with the specification and renders the claim term "sequential" superfluous.

### a.    The Court Should Adopt PBNT's Construction Based on the Intrinsic Record

The phrase "multiple unit dose schedule" in PBNT's construction is the applicant's own language in the specifications,[26] which describes two overarching dosage embodiments for the

---

[26] "[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (quotation omitted).

alleged invention: "Dosage can be by a *single unit dose schedule* or a *multiple unit dose schedule*." '475 Patent, 21:1-2. The disputed claim term, which requires "at least two unit doses," is clearly the second embodiment.

The specifications further describe a "multiple unit dose schedule," explaining that "[m]ultiple doses may be used in a primary immunization *schedule* and/or in a booster immunization *schedule*," and "the various doses may be given by the same or different routes" "typically…administered at least 1 week apart." '475 Patent, 21:1-10.

Therefore, the specifications make clear that multiple unit doses must be part of the same dose "schedule," which supports PBNT's construction.

### b. The Court Should Reject GSK's Construction

#### i. GSK's Construction Would Render the Claim Term "Sequential" Superfluous

GSK's position that no construction is necessary fails to give any meaning to the term "sequential." That term necessarily carries meaning beyond the condition that two doses are administered at least one week apart, which the surrounding claim language already requires. PBNT's construction gives "sequential" meaning based on the applicant's own description of the claimed embodiment—that the multiple doses are administered according to a "multiple unit dose schedule." *See Bicon, Inc.*, 441 F.3d at 950 ("claims are interpreted with an eye toward giving effect to all terms in the claim"—no language is "merely superfluous"). Without such meaning, the term "sequential" becomes superfluous.

#### ii. GSK Improperly Assumes the Term "Sequential" Has Just One Plain and Ordinary Meaning

GSK fails to describe the purported sole, plain and ordinary meaning of "sequential," and merely stating that the claim language requires no construction "does not resolve the parties' dispute" over whether the relevant claims require a multi-unit dose schedule. *O2 Micro Int'l Ltd.*

59

*v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute").

Although the Court need not reach extrinsic evidence to resolve this dispute, PBNT's construction—which, again, comes directly from the specification—also is consistent with common dictionary definitions.  For example, Merriam-Webster's Medical Dictionary 2006 defines "sequential" as "of, relating to, forming, or taken or administered in a sequence," and defines "sequence" as "a continuous or connected series."  JA-011, 685.  In another example, the Oxford Dictionary of English 2010, defines "sequence" as "a set of related events, movements, or items that follow each other in a particular order."  JA-012, 1624.  Similarly, Taber's Cyclopedic Medical Dictionary (2005) defines "sequencing" as "[t]he application of particular treatments in a specific order rather than randomly or haphazardly."  JA-013, 1976.  As these definitions confirm, "sequential" items are "continuous or connected," "related," and "in a specific order"—like a schedule.

In contrast, GSK seems to read the claims as covering *un*related doses administered years apart in no specific order, but that position does not comport with the specifications, which describe administering the same formulation at, predetermined time intervals.  Thus, without construction, a jury might misunderstand the term "sequential" as extending beyond the disclosures of the specification.  Failure to construe this claim term, as GSK urges, would "not resolve the parties' dispute."  *O2 Micro*, 521 F.3d at 1361.

### iii.    GSK Improperly Focuses on the Jury's Perspective Instead of a POSA's Perspective in View of the Intrinsic Record

GSK's argument that a plain-meaning construction is needed to avoid jury confusion ignores the legal standard, which requires adopting "the meaning that the term would have to a

person of ordinary skill in the art," who "is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Phillips*, 415 F.3d at 1313. As discussed, the specifications support only PBNT's construction.

Furthermore, absent an accepted technical meaning, the claims should be construed no more broadly than the intrinsic record supports, which here directs a POSA to a "multiple unit dose schedule," not free-floating lay notions of what "sequential" means. *Irdeto Access, Inc. v. Echostar Satellite Corp.*, 383 F.3d 1295, 1300 (Fed. Cir. 2004) ("[A]bsent such an accepted meaning, we construe a claim term only as broadly as provided for by the patent itself.").

GSK's remaining arguments lack merit. GSK describes the term "multiple unit dose schedule" as "jargon," but this is how the applicant described in the Asserted Patents dosing with more than one unit dose. GSK's argument that PBNT is importing an "extraneous limitation" is unconvincing for the same reason. Again, PBNT's construction uses the applicant's words in the specifications to avoid jury confusion regarding the meaning of the claim term "sequential." *Cf. Wang Labs., Inc. v. Am. Online, Inc.*, 197 F.3d 1377, 1383 (Fed. Cir. 1999) (finding the scope of a claim to be limited by the disclosures of the specification).

GSK should not be allowed to use the phrase "at least two unit doses being sequential and at least 1 week apart" to support a contrived infringement theory, e.g., that taking two single unit doses according to separate dose schedules (such as two unrelated Covid-19 booster shots) falls within the claim scope merely because one comes after the other. That is not the method of treatment the applicant claims to have invented. Rather, the claims plainly cover "a multiple unit dose schedule," which is distinguished from a "single unit dose schedule." '475 Patent, 21:1-2.

61

### 3.    Plaintiff's Reply Position

PBNT's attempt to inject the phrase "multiple unit dose schedule" into the claim should be rejected for at least three reasons.  *First*, PBNT reveals its true motivation for its proposed construction—to avoid infringement—in the last paragraph of its answering brief.  Section III(E)(2)(b)(ii) at 61 (accusing GSK of a "contrived infringement theory").  That PBNT bases its construction, at least in part, on the accused products, is plainly improper.  *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) (en banc).

*Second*, neither the claim language nor specifications require that more than one dose be part of a schedule, much less a particular multiple unit dose schedule.  The specifications merely state that "[d]osage *can be* by a single unit dose schedule or a multiple unit dose schedule."  '475 Patent at 21:1–2.  Although PBNT argues that at least two unit doses "is clearly the [multiple unit dose schedule] embodiment" (Ans. Br. 29), multiple merely means more than one and the claim already makes that clear, reciting "at least two unit doses."

*Third*, PBNT's proposed construction improperly creates a construction-within-a-construction. The specifications describe that a "multiple unit dose schedule" involves doses "administered at least 1 week apart," which the claim already recites.  But PBNT goes further, contending that a multiple unit dose schedule requires "related" doses.  Section III(E)(2)(b)(ii) at 59, 61.    That "related" requirement—absent from the claims and from PBNT's proposed construction—creates unnecessary ambiguity and complexity.  '475 Patent at 21:17–19.

Nor does GSK's construction, as PBNT suggests (Section III(E)(2)(b)(ii) at 61), render "sequential" superfluous.  The claims' recitation of "sequential" makes clear that when more than one unit dose is administered, they are not administered simultaneously.  If anything, PBNT's extra verbiage introduces duplicative limitations ("sequential" and "multiple unit dose schedule").  Regardless, the claim language would be understandable even to a lay person and, accordingly, no

construction is necessary. *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is…not an obligatory exercise in redundancy.").

### 4.    Defendants' Sur-Reply Position

Only PBNT's construction gives meaning to the term "sequential" by clarifying it requires "a multiple unit dose schedule," which is exactly how the patentee described the claimed invention. GSK does not dispute that the intrinsic record describes only two overarching embodiments of what the "[d]osage can be"—"[1] a *single unit dose schedule* or [2] a *multiple unit dose schedule*." '475 Patent, 21:1-2.  The claim language, "at least two unit doses being sequential…at least 1 week apart," clearly refers to the second embodiment.

GSK offers no credible alternative for its meaning of "sequential."  It argues that this word "makes clear that when more than one unit dose is administered, they are not administered simultaneously." *Supra*, 62.  But the surrounding claim language precludes simultaneous administration by requiring two doses "at least 1 week apart."  If "sequential" meant "not administered simultaneously," the term would be superfluous.  Courts "giv[e] effect to *all* terms in the claim"—none is "merely superfluous." *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006).

GSK's remaining arguments lack merit.  First, it is entirely permissible to construe claims "to avoid infringement." *Supra*, 62.  GSK's own caselaw makes clear that claim construction is "for use in the determination of infringement." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997).  This does not mean PBNT's construction is based "on the accused products." *Supra*, 62.  PBNT's construction is based on the patentee's own description of the claimed embodiment.

Second, GSK's argument that claimed doses need not "be part of a schedule," *id*., reveals the extraordinary scope of its construction, which lacks support in the specification.  GSK never

63

disputes that its construction would encompass two unscheduled doses administered many years apart, yet the specifications describe only "a single unit dose *schedule* or a multiple unit dose *schedule*"—there is nothing else the "[d]osage can be." '475 Patent, 21:1-2.

Third, GSK's argument that "PBNT's proposed construction improperly creates a construction-within-a-construction" by "requir[ing] 'related' doses," *supra*, 62, is a strawman. PBNT's construction does not include the term "related." PBNT's construction includes only the patentee's clear description of "a multiple unit dose schedule." This is the correct construction.

### F. "WHEREBY THE PKA IS DETERMINED AT STANDARD TEMPERATURE AND PRESSURE BY THE FOLLOWING . . . IS OBTAINED"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "whereby the pKa is determined at standard temperature and pressure by the following . . . is obtained"<br><br>U.S. Patent No. 11,638,693 (All asserted claims)<br><br>U.S. Patent No. 11,638,694 (All asserted claims)<br><br>U.S. Patent No. 11,666,534 (Claims 25–27)<br><br>U.S. Patent No. 11,766,401 (Claims 21, 22, 24)<br><br>U.S. Patent No. 11,786,467 (Claims 28, 29) | No construction necessary: Plain & ordinary meaning, *i.e.*:<br><br>whereby the pKa is determined at standard temperature and pressure by the following . . . is obtained | This limitation is an active process step that must be performed, rendering the formulation patent claims invalid as indefinite. |

GSK's Op. CC Brief, 18.

### 1.    Plaintiff's Opening Position

The Court should adopt GSK's unopposed construction for the pKa limitations.  *See* D.I. 122 at 38–39.  With no competing construction offered by PBNT, there is no dispute that GSK's construction reflects the plain and ordinary meaning of the pKa claim terms, which do not require explanation beyond the claim language itself.  *E.g.*, '467 Patent at 1:35–43, 2:7–44, 23:21–31:25, Fig. 15, Claims 28–29; *see Par Pharm.*, 2024 WL 4100255, at \*6 ("Because the plain and ordinary meaning of the term is apparent from the language of the claims themselves, no construction is needed . . . .").

Rather than put forth a construction for these limitations, PBNT incorrectly suggest they are indefinite.  GSK reserves its rights to respond to PBNT's indefiniteness arguments in due course, as indefiniteness is an issue of invalidity, which PBNT must prove by clear and convincing evidence.  *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017); *see also Datacore Software Corp. v. Scale Computing, Inc.*, 2023 WL 5207928, at \*5–6 (D. Del. Aug. 14, 2023) ("In some cases, . . . resolution of indefiniteness as part of claim construction may be either impossible or inadvisable.").

### 2.    Defendants' Answering Position

The parties dispute whether the asserted formulation claims that also recite the method step, "whereby the pKa is determined at standard temperature and pressure by the following…is obtained," are invalid as indefinite. Those claims are indefinite because while they purport to claim a "formulation," they also require a series of method steps.  Federal Circuit precedent and caselaw from this District confirm that these mixed composition/method claims are indefinite because they fail to provide notice of when infringement occurs.  *See IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005); *Aventis Pharma S.A. v. Hospira, Inc.*, 743 F. Supp. 2d 305, 330 (D. Del. 2010).

### a.        Mixed Formulation and Method pKa Claims Are Indefinite

Under *IPXL*, mixed claims are indefinite because they "recite[] both a system and the method for using that system," and one cannot know whether they infringe a claim by (1) merely making the system, or (2) by practicing the method for using the system.  *See IPXL*, 430 F.3d at 1384; *see also KOM Software Inc. v. NetApp, Inc.*, No. CV 18-160-WCB, D.I. 116 at 31-32 (D. Del. May 18, 2023) ("The problem with such claims is that they fail to make it clear to a skilled artisan whether infringement occurs when one creates a system with the capabilities described in the claim, or whether infringement occurs only when the system is used in an infringing manner."); *Cisco Sys. v. Ramot at Tel Aviv Univ. Ltd.*, C.A. No. 21-1365-GBW, 2024 WL 4751590, at *6 (D. Del. Nov. 12, 2024) ("A system claim may be indefinite, if it recites a function that appear in isolation and is not specifically tied to structure.) (cleaned up).

In the pharmaceutical context, this District has invalidated claims requiring (1) a composition limitation, and (2) a method limitation whereby said composition is used to form an injectable solution.  In *Aventis*, the court found "ambiguity as to whether additional steps beyond the creation of a suitable stock solution are necessary in order to infringe the disputed claims, and whether particular acts constitute infringement" based on the following limitations: "whereby said composition is used to form an injectable solution" and "whereby said therapeutic composition forms or issued to form an injectable solution."  743 F. Supp. 2d at 329-30.

The claims at issue here suffer from the same claim-drafting flaw.  First, the 14 pKa process steps recite a method requiring an individual to carry out specific actions.  *See, e.g.*, '693 Patent, claim 1; Forrest, ¶ 76; *see also HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270, 1277 (Fed. Cir. 2012) (explaining that in *IPXL*, the claim "was ambiguous because it recited both a system that allowed a user to practice a method step and the user's practicing the method step").  These

66

recited steps for determining pKa and the language "is determined" distinguish this limitation from one that merely describes a function or characteristic of the formulation.

Second, the claimed method for determining the pKa of the cationic lipid "appear[s] in isolation and [is] not specifically tied to the structure" of the formulation. *KOM Software*, No. CV 18-160-WCB, D.I. 116 at 34 n.6. The claimed formulation can function irrespective of whether the pKa is determined using the claimed steps. That is, determining the pKa of the cationic lipid is divorced from the functionality of the formulation itself. Thus, an accused infringer would not know if it practices the claim when simply preparing the formulation, or only after completing the claimed 14 steps to "determine" the pKa. *See Aventis*, 743 F. Supp. 2d at 330.

### b.    The Prosecution History Supports PBNT's Position

During prosecution of the '467 Patent, the examiner rejected pending claim 10 in view of prior art rendering the recited process for determining pKa obvious. '019 Application, 05/31/22 Non-Final Rejection, 18-23. To overcome this rejection, the applicant amended claim 10 to add six process steps and changed the preceding language from "pKa is ***determined***" to "pKa is ***defined***." *Id.*, 10/12/22 Amendments to the Claims, 6-8. The applicant argued that the prior art does not disclose "***methods*** to obtain" the pKa values of "any cationic lipids by themselves." *Id.*, 10/12/22 Remarks, 26). The examiner then required the applicant to change "is defined" back to "is determined" and ultimately allowed the claims. *Id.,* 1/23/23 Notice of Allowance, 3-5. Thus, by its own terms, the claimed pKa "is determined" by the recited method. *See Aventis*, 743 F. Supp. 2d at 329–30 ("[B]y its own terms, the claimed stock solution actually forms an injectable solution or actually is used to form an injectable solution.").

During prosecution, the applicant also specifically referred to the process of determining the pKa as a "method[] to obtain and report the pKa values." '019 Application, 10/12/22 Remarks,

67

26.   In sum, just as in *Aventis*, the pKa claims are invalid for reciting mixed composition- and method-type limitations.

### 3.    Plaintiff's Reply Position

The Court should adopt GSK's unopposed construction and decline to consider PBNT's invalidity arguments at this stage. *See Pernix Ire. Pain Ltd. v. Actavis Labs. FL, Inc.*, 2017 WL 3314005, at *1 n.3 (D. Del. Aug. 3, 2017) ("The court does not typically address indefiniteness arguments at the claim construction stage."); *see also Software Corp. v. Scale Computing, Inc.*, 2023 WL 5207928, at *5–6 (D. Del. Aug. 14, 2023).   If the Court does consider PBNT's indefiniteness theory, it should reject it.

PBNT's *IPXL* indefiniteness theory is that the pKa limitations render unclear whether a formulation infringes "(1) when the formulation is created or (2) after the cationic lipids have undergone measurements by a person to determine the pKa values." JA-006 Attach. 7 at 920; Section III(F)(2)(1)(b) at 67.  To be clear, a pKa value is a measured property—in the case of ionizable lipids (as here), it is "[t]he pH at which the relative abundance of the two forms of a lipid—neutral and protonated [positively charged]—is equal *under that set of conditions*." JA-008 Forrest Op. Decl. ¶¶44–45.  The claims set out the testing procedure and conditions for obtaining the pKa value required by the claims; they do not set forth a process step. *E.g.*, '467 Patent at 1:35–43, 2:7–44, 23:21–31:25, Fig. 15, Claims 28–29.  Contrary to PBNT's assertion that the pKa limitations create ambiguity, the recited steps eliminate any potential ambiguity by specifying which procedure and conditions to use.

In any case, when it is "clear" when "infringement occurs," claims are not indefinite under *IPXL*. *MasterMine Software, Inc. v. Microsoft Corp.*, 874 F.3d 1307, 1316 (Fed. Cir. 2017); *KOM Software Inc. v. NetApp, Inc.*, 1:18-cv-00160-WCB, D.I. 116, at 31–35 (D. Del. May 18, 2023) (attached as JA-007 Attach. 8).  That is the case here.  Because the pKa value is a property of the

ionizable cationic lipid when measured under the specified conditions, that property holds regardless of how that lipid is later employed.  Thus, if the pKa limitation is satisfied, infringement would occur at least when PBNT makes, uses, sells, and offers for sale the accused products even if the pKa of the cationic lipid is never measured under the required conditions.[27]

PBNT's reliance on *Aventis* is misplaced.  *See* Section III(F)(2)(1)(a) and (b) at 66–68 (citing *Aventis Pharma S.A. Hospira, Inc.*, 743 F. Supp. 2d 305 (D. Del. 2010)).  In *Aventis*, after a full bench trial, the court examined claims to a "composition" "whereby" that composition "***forms or is used to form*** an injectable solution."  *Aventis*, 743 F. Supp. 2d at 328 (italics original). The *Aventis* claims had an *IPXL* problem because it was unclear if infringement occurred when the composition was made or when the composition was later "form[ed]" into "an injectable solution."  *Id.* at 330.  The court accordingly determined the claims were indefinite because "[n]either the claims nor the specification provide guidance as to when direct infringement is complete." *Id.* at 331.  In stark contrast, here, no credible question exists as to when infringement occurs.

Further, the prosecution history confirms—rather than contradicts (*contra* Section III(F)(2)(1)(b) at 67–68)—that the pKa limitations of the claims pertain to a property of the ionizable lipid, not of any finished formulation.  The Examiner preliminarily rejected claims with the pKa limitations for obviousness in view of certain prior art because the Examiner misunderstood that art to disclose the same pKa measurement method and conditions in GSK's claims. '019 Application, May 31, 2022 Non-Final Rejection, at 19–23.  GSK did ***not*** distinguish that prior art by arguing that the art did "not disclose '***methods***'" of measuring pKa (*contra* Section

---

[27] PBNT's argument improperly attempts to expand the "narrow" reach of *IPXL* in ways already rejected by several courts.  *See Jackson v. NuVasive, Inc.*, 2025 WL 823229, at *4–6 (D. Del. Mar. 14, 2025).

III(F)(2)(1)(b) at 67 (emphasis original)); it explained that that prior art method measured pKa of fully formulated "lipid particles," while the asserted claims measure the pKa of "the cationic lipids by themselves." '019 Application, Oct. 12, 2022 Appl. Arg. & Remarks, at 26–30. Based at least on that distinction, the Examiner withdrew the obviousness rejection. *Id.*, Nov. 23, 2022 Final Rejection, at 5–6. That prosecution history reflects GSK's and the Examiner's shared understanding that the pKa limitations of the claims at issue here refer to a ***characteristic*** of the cationic lipids independent of the formulation, ***not*** a process step for the formulation of the claims.

Accordingly, the Court should adopt GSK's unopposed construction of the pKa terms and, if the Court reaches PBNT's *IPXL* challenge, reject PBNT's indefiniteness argument.

### 4.    Defendants' Sur-Reply Position

GSK does not dispute that mixed composition/method claims are indefinite—a finding the Court should make now at the *Markman* stage. *See Cisco Sys. Inc. v. Ramot at Tel Aviv Univ. Ltd.*, No. 21-1365-GBW, 2024 WL 4751590, at *6 (D. Del. Nov. 12, 2024). GSK's argument that the pKa limitations "do not set forth a process step," *supra*, 68, contradicts the claims, which explicitly recite a 14-step method by which pKa "is determined." The prosecution history confirms this language requires user action. GSK proposed claims stating only that pKa is a characteristic "defined" by the recited measurements. '019 Application, 10/12/22 Amendments, 6-8. But the examiner rejected those claims. *Id.*, 11/23/22 Final Rejection. To secure allowance, GSK replaced "defined" with "*is determined*"—an explicit method. *Id.*, 12/12/22 Email to Examiner, Att. at 2; *id.*, 1/23/23 Notice of Allowance, 2-3.

GSK's arguments distinguishing prior art that measured "fully formulated 'lipid particles'" instead of "the cationic lipids by themselves," *supra*, 70, confirm that GSK claimed "methods." '019 Application, 10/12/22 Remarks, 30 (distinguishing prior art "method[s]"). The claims are thus indefinite because it is unclear whether infringement occurs when the formulation is made or

70

when the pKa "is determined," which may occur (if at all) well after the formulation is made or sold.

### G. "THE FORMULATION IS IMMUNOGENIC IN VIVO BY ELICITING AN ANTIBODY RESPONSE AGAINST THE [FIRST] IMMUNOGEN [AND THE SECOND IMMUNOGEN] IN VIVO"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "the formulation is immunogenic in vivo by eliciting an antibody response against the immunogen in vivo"<br><br>U.S. Patent No. 11,638,693 (All asserted claims)<br><br>U.S. Patent No. 11,786,467 (All asserted claims)<br><br>AND<br><br>"the formulation is immunogenic in vivo by eliciting an antibody response against the first immunogen and the second immunogen in vivo"<br><br>U.S. Patent No. 11,638,694 (All asserted claims) | No construction necessary: Plain & ordinary meaning, *i.e.*:<br><br>the formulation is immunogenic in vivo by eliciting an antibody response against the immunogen in vivo<br><br>AND<br><br>the formulation is immunogenic in vivo by eliciting an antibody response against the first immunogen and the second immunogen in vivo | This limitation is an active process step that must be performed, rendering the formulation patent claims invalid as indefinite.<br><br>AND<br><br>This limitation is an active process step that must be performed, rendering the formulation patent claims invalid as indefinite. |

GSK's Op. CC Brief, 19-20.

#### 1.    Plaintiff's Opening Position

Similar to the pKa limitations above, *supra* Part VII, the Court should adopt GSK's unopposed construction of the immunogenic limitations, which retain the plain and ordinary meaning of their respective claim language. *E.g.*, '467 Patent at 7:42–57, 13:6–8, 14:3–8, 14:51–56, 31:27–36:64, Figs. 7–9, 11–12, 14A, 14B, 16–18, Claim 1; *see* D.I. 122 at 44; *Par Pharm.*,

71

2024 WL 4100255, at *6.  GSK reserves its rights to respond to any assertions of indefiniteness PBNT may argue in its claim construction briefing.  *See supra* Part VII.

### 2.    Defendants' Answering Position

The parties dispute whether the claim limitation "the formulation is immunogenic in vivo by eliciting an antibody response against the [first] immunogen [and the second immunogen] in vivo" renders the asserted claims in the '693 Patent, '467 Patent, and the '694 Patent indefinite under *IPXL* and *Aventis* for reasons similar to those discussed in the prior section.

### a.    Mixed Formulation and Method Immunogenicity Claims Are Indefinite

The claims reciting immunogenicity terms are indefinite because they all claim a "formulation" that "is immunogenic in vivo by eliciting an antibody response," thus requiring the method step of administering the claimed formulation to elicit the antibody response in vivo. Especially in view of the prosecution history discussed below, it is unclear to a POSA "at what point during these processes the infringement is complete."  *Aventis*, 743 F. Supp. 2d at 330.

Like in *Aventis* and *Cisco*, a POSA does not know whether the claims are infringed by simply making the formulation, or only after determining that the formulation is immunogenic in vivo. And the formulation is only immunogenic in vivo after performing the method of *administering* the formulation to an individual.  Thus, the claim language creates ambiguity as to whether infringement occurs when the formulation is merely created, or after it has been administered, or even after it has elicited an antibody response.

### b.    The Prosecution History Supports PBNT's Position

The prosecution history forecloses an argument by GSK that the claims merely require a formulation *suitable* for being immunogenic.  During prosecution of the '467 Patent, the examiner twice rejected pending claims reciting "a formulation eliciting an antibody response against the

72

immunogen" over a prior art reference—MacLachlan—that taught "cationic liposomes comprising an immunogen encoding RNA *suitable* for in vivo delivery and capable of eliciting a protective immune response."  '019 Application, 5/31/22 Non-Final Rejection, 7; *see also id.,* 11/23/22 Final Rejection, 7-8 (same).  The applicant amended the claims to overcome MacLachlan by requiring that the formulation "is immunogenic *in vivo* by eliciting an antibody response against the immunogen *in vivo*."  *Id.*, 1/23/23 Notice of Allowance, 2.  Because MacLachlan taught cationic liposomes that were *suitable* for eliciting a protective immune response, the amended claims require more than mere suitability for eliciting an antibody response—they require that the formulation *actually elicits* an antibody response (i.e., is immunogenic in vivo by eliciting an antibody response…"), which can only be achieved when the formulation is administered.

### 3.    Plaintiff's Reply Position

Like the pKa limitations, the Court should adopt GSK's unopposed construction for the immunogenic limitations and, if it reaches invalidity at this stage, reject PBNT's *IPXL* argument. PBNT once again tries to twist the claims to turn a characteristic of the formulation (that it "is immunogenic") into a process step that finds no support in the claims, specifications, or prosecution histories.  *See supra* Part VI.  That the formulation is immunogenic *in vivo* is a characteristic of the formulation.  Thus, infringement is complete at least when an infringing formulation is made, used, sold, and offered for sale regardless of when or if the formulation is administered and when or if the immunogenicity of the formulation is assessed after administration.

### 4.    Defendants' Sur-Reply Position

GSK does not dispute that the only way to tell a formulation "is immunogenic in vivo" is to *administer* it—a method step that renders the claims indefinite.

Ignoring the prosecution history, GSK asserts that whether "the formulation is immunogenic in vivo is a characteristic of the formulation." *Supra*, 73. Yet, the examiner repeatedly *rejected* claims lacking this limitation over prior art teaching formulations with the characteristic of being "*suitable* for in vivo delivery and *capable* of eliciting a protective immune response." '019 Application, 5/31/22 Non-Final Rejection, 7; 11/23/22 Final Rejection, 7-8 (same); 12/22/21 Prelim. Amendment, 2 (original claims). In response, GSK repeatedly distinguished the prior art by insisting its claimed invention requires *more* than just a characteristic—it requires actually *achieving* an antibody response *in vivo*.

First, GSK amended the claims to require that "the formulation *elicits* an antibody response against an immunogen," arguing the prior art "does not provide an expectation of success in *using* RNA encoding an immunogen to elicit an antibody response." *Id*., 10/12/22 Amendment, 5, 23; *see also id*., 21-24 & O'Hagan Decl., ¶¶15-22. Second, when the examiner found this language insufficient, GSK went further, proposing additional amendments that resulted in the final claim language requiring a formulation that "is immunogenic *in vivo by eliciting an antibody response against the immunogen in vivo*." *Id*., 12/12/22 Email to Examiner, Att. at 1. In allowing the claims, the examiner distinguished the prior art because it "suggest[ed] an immunogenic composition" but did "not reduce such a composition to practice," whereas the named inventor allegedly was "the first to successfully make *and use*" such a composition. *Id*., 1/23/23 Notice of Allowance, 9-10.

The prosecution history, which GSK ignores, makes clear the claims require *more* than just characteristics of being "suitable" for in vivo delivery or "capable" of immunogenicity. Instead, the claims require a formulation that "*is* immunogenic *in vivo by eliciting an antibody response against the immunogen in vivo*"—language that distinguishes the prior art only if the formulation

74

is administered.  The claims are thus indefinite because it is unclear if infringement occurs when the formulation is made or when it elicits an antibody response against the immunogen in vivo.

## IV.    CONCLUSIONS

### A.    Plaintiff's Conclusion

For the foregoing reasons, GSK respectfully requests that the Court adopt GSK's proposed constructions.

### B.    Defendants' Conclusion

PBNT respectfully requests that the Court adopt its proposed constructions.

75

/s/ Kelly E. Farnan
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com

OF COUNSEL:

John Desmarais
Kerri-Ann Limbeek
Michael E. Furrow
Karl Mullen
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
(212) 351-3400

Justin P. D. Wilcox
David J. Shaw
Thomas J. Derbish
Rebecca A. Lindhorst
Eric Speckhard
Jamie Dohopolski
DESMARAIS LLP
1899 Pennsylvania Avenue, NW
Suite 400
Washington, D.C. 20006
(202) 451-4900

Ada Locke
DESMARAIS LLP
101 California Street
Suite 3000
San Francisco, CA 94111
(415) 573-1900

*Attorneys for Plaintiffs GlaxoSmithKline
Biologicals SA and GlaxoSmithKline LLC*

/s/ Jeremy A. Tigan
Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
Anthony D. Raucci (#5948)
MORRIS, NICHOLS, ARSHT & TUNNELL
LLP
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com
araucci@morrisnichols.com

*Attorneys for Defendants Pfizer Inc.,
Pharmacia & Upjohn Co. LLC, BioNTech SE,
BioNTech Manufacturing GmbH, and
BioNTech US Inc.*

OF COUNSEL:

Sara Tonnies Horton
Ren-How Harn
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle Drive
Chicago, IL 60654-3406
(312) 728-9000

Matthew Freimuth
Nicholas Vennekotter
WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, NY 10019
(212) 728-8000

*Attorneys for Defendants Pfizer Inc. and
Pharmacia & Upjohn Co. LLC*

Charles B. Klein
Jovial Wong
Claire Fundakowski
WINSTON & STRAWN LLP
1901 L Street, NW
Washington, D.C. 20036
(202) 282-5000

76

David P. Dalke, Ph.D
Michael A. Meneghini
Zoe A. Goldstein
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
(312) 558-5600

Eimeric Reig-Plessis
Noorossadat Torabi
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
(415) 591-1000

*Attorneys for Defendants BioNTech SE,
BioNTech Manufacturing GmbH, and
BioNTech US Inc.*

Dated: March 12, 2026

77